FILED

2009 APR -8 PM 4:25

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

BY: _____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

October 2008 Grand Jury

**SACR09-0077**

| | |
|---|---|
| UNITED STATES OF AMERICA, | SA CR No. _____ |
| Plaintiff, | I N D I C T M E N T |
| v. | [18 U.S.C. § 371: Conspiracy; 15 U.S.C. § 78dd-2: Foreign Corrupt Practices Act; 18 U.S.C. § 1952: Travel Act; 18 U.S.C. § 1519: Destruction of Records; 18 U.S.C. § 2: Aiding and Abetting and Causing an Act To Be Done] |
| STUART CARSON, HONG CARSON, a/k/a "Rose Carson," PAUL COSGROVE, DAVID EDMONDS, FLAVIO RICOTTI, and HAN YONG KIM, | |
| Defendants. | |

The Grand Jury charges:

INTRODUCTION

At all times relevant to this Indictment:

1.   The Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15, United States Code, Sections 78dd-1, *et seq.*, was enacted by Congress for the purpose of making it unlawful,

among other things, for certain United States persons and business entities to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value to a foreign government official (or to any person, while knowing that the money or thing of value will be offered, given or promised to a foreign official), for the purpose of securing any improper advantage, or of assisting in obtaining or retaining business for and with, or directing business to, any person.

2.   The Travel Act, Title 18, United States Code, Section 1952, makes it unlawful to travel in interstate or foreign commerce or use the mail or any facility in interstate or foreign commerce, with intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of certain unlawful activity, including commercial bribery in violation of the laws of the state of California.

<u>Relevant Individuals and Entities</u>

3.   Company A was a Delaware corporation headquartered in Rancho Santa Margarita ("RSM"), California, that designed and manufactured control valves for use in the nuclear, oil and gas, and power generation industries worldwide.   Company A sold its products to both state-owned and private companies in over thirty countries around the world.   Because Company A was organized under the laws of a State of the United States and had its principal place of business in the United States, it was a "domestic concern" as that term is defined in the FCPA.

4.   Defendant STUART CARSON ("S. CARSON") was the Chief Executive Officer ("CEO") of Company A from in or around 1989 through in or around 2005.   Defendant S. CARSON was the prime

2

architect of Company A's friend-in-camp ("FIC") sales model, in which Company A employees and agents cultivated special relationships with employees of its state-owned and private customers.  In many instances, Company A employees and agents made corrupt payments to the FICs for the purpose of obtaining and retaining business for Company A.  Company A personnel sometimes referred to these corrupt payments as "flowers."  From in or around January 2003 through in or around August 2005, defendant S. CARSON caused Company A employees and agents to make corrupt payments totaling approximately $4.3 million to officers and employees of state-owned companies, and corrupt payments totaling approximately $1.8 million to officers and employees of private companies.  Defendant S. CARSON was a citizen of the United States and thus was a "domestic concern" and an officer, director, employee and agent of a "domestic concern" as those terms are defined and used in the FCPA.

5.    Defendant HONG CARSON, also known as "Rose Carson" ("R. CARSON"), was Company A's Manager of Sales for China and Taiwan from in or around 1995 through in or around 2000 and then served as the Director of Sales for China and Taiwan from in or around 2000 through in or around 2007.  Defendant R. CARSON was the wife of defendant S. CARSON.  From in or around 2003 through in or around 2007, defendant R. CARSON caused Company A employees and agents to make corrupt payments totaling approximately $1 million to officers and employees of state-owned companies, and corrupt payments totaling approximately $43,000 to officers and employees of private companies.  Additionally, on or about August 17, 2007, after learning that Company A had hired counsel to conduct an

3

1   internal investigation into Company A's corrupt payments, and
2   just prior to her interview with Company A's counsel, defendant
3   R. CARSON intentionally destroyed documents by flushing the
4   documents down a toilet in the Company A ladies' room.  Defendant
5   R. CARSON was a citizen of the United States and thus was a
6   "domestic concern" and an employee and agent of a "domestic
7   concern" as those terms are defined and used in the FCPA.
8       6.    Defendant PAUL COSGROVE ("COSGROVE") was Executive Vice
9   President of Company A from in or around 2002 through in or
10  around 2007 and served as the Head of Company A's Worldwide Sales
11  Department from in or around 1992 through in or around 2007.
12  Defendant COSGROVE was the second highest ranking executive at
13  Company A and was responsible for approving many of the corrupt
14  payments made by employees and agents of Company A to officers
15  and employees of state-owned and private companies.  From in or
16  around 2003 through in or around 2007, defendant COSGROVE caused
17  Company A employees and agents to make corrupt payments totaling
18  approximately $1.9 million to officers and employees of state-
19  owned companies, and corrupt payments totaling approximately
20  $300,000 to officers and employees of private companies.
21  Defendant COSGROVE was a citizen of the United States and thus
22  was a "domestic concern" and an officer, director, employee and
23  agent of a "domestic concern" as those terms are defined and used
24  in the FCPA.
25      7.    Defendant DAVID EDMONDS ("EDMONDS") was the Vice-
26  President of Worldwide Customer Service at Company A from in or
27  around 2000 through in or around 2007.  In this capacity,
28  defendant EDMONDS oversaw Company A's replacement parts sales and

4

the servicing of existing valves.  From in or around 2003 through in or around 2007, defendant EDMONDS caused Company A employees and agents to make corrupt payments totaling approximately $430,000 to officers and employees of state-owned companies, and corrupt payments totaling approximately $220,000 to officers and employees of private companies.  Defendant EDMONDS was a citizen of the United States and thus was a "domestic concern" and an employee and agent of a "domestic concern" as those terms are defined and used in the FCPA.

8.    Defendant FLAVIO RICOTTI ("RICOTTI") was Company A's Vice-President and Head of Sales for Europe, Africa, and the Middle East ("EAME") from in or around 2001 through in or around 2007.  From in or around 2003 through in or around 2007, defendant RICOTTI caused Company A employees and agents to make corrupt payments totaling approximately $750,000 to officers and employees of state-owned companies, and corrupt payments totaling approximately $380,000 to officers and employees of private companies.  Defendant RICOTTI was a citizen of Italy and served as an agent of Company A and thus was an agent of a "domestic concern" as that term is defined and used in the FCPA.

9.    Defendant HAN YONG KIM ("KIM") was the President of Company A's Korean office from in or around 1997 through in or around 2005.  From in or around 2005 through in or around 2007, defendant KIM served as a consultant to Company A's Korean office.  From in or around 2003 through in or around 2007, defendant KIM caused Company A employees and agents to make corrupt payments totaling approximately $200,000 to officers and employees of state-owned companies, and corrupt payments totaling

approximately $350,000 to officers and employees of private
companies.   Defendant KIM was a citizen of Korea and served as an
agent of Company A and thus was an agent of a "domestic concern"
as that term is defined and used in the FCPA.

   10.   Richard Morlok ("Morlok") was Company A's Finance
Director from in or around 2002 through in or around 2007.   From
in or around 2003 through in or around 2006, Morlok caused
Company A employees and agents to make corrupt payments totaling
approximately $628,000 to officers and employees of state-owned
companies.   Morlok was a citizen of the United States and thus
was a "domestic concern" and an employee and agent of a "domestic
concern" as those terms are defined and used in the FCPA.

   11.   Mario Covino ("Covino") was Company A's Director of
Worldwide Factory Sales from in or around March 2003 through in
or around 2007.   In this capacity, he was responsible for
overseeing Company A's new construction projects and the
replacement of existing valves made by other companies and
installed at Company A's customer's plants.   From in or around
2003 through in or around 2007, Covino caused Company A employees
and agents to make corrupt payments totaling approximately $1
million to officers and employees of state-owned companies.
Covino was a resident of the United States and thus was a
"domestic concern" and an employee and agent of a "domestic
concern" as those terms are defined and used in the FCPA.

   12.   Company A's state-owned customers included, but were
not limited to, Jiangsu Nuclear Power Corporation ("JNPC")
(China), Guohua Electric Power (China), China Petroleum Materials
and Equipment Corporation ("CPMEC"), PetroChina, Dongfang

Electric Corporation (China), China National Offshore Oil
Corporation ("CNOOC"), Korea Hydro and Nuclear Power ("KHNP"),
Petronas (Malaysia), and National Petroleum Construction Company
("NPCC") (United Arab Emirates).   Each of these state-owned
entities was a department, agency, and instrumentality of a
foreign government, within the meaning of the FCPA.   The officers
and employees of these entities, including the Vice-Presidents,
Engineering Managers, General Managers, Procurement Managers, and
Purchasing Officers, were "foreign officials" within the meaning
of the FCPA.

        13.   Company A's private company customers included, but
were not limited to, Company 1, Company 2, Company 3, Company 4,
and Company 5.

Overview of the Corrupt Payments

        14.   Beginning in or around 1998 and continuing through in
or around August 2007, defendants S. CARSON, R. CARSON, COSGROVE,
EDMONDS, RICOTTI, and KIM, as well as Morlok, Covino, Company A
and others known and unknown to the Grand Jury, made and caused
Company A employees and agents to make corrupt payments to
officers and employees of numerous state-owned and privately-
owned customers around the world for the purpose of assisting in
obtaining or retaining business for Company A.   Between in or
around 2003 and in or around 2007, these corrupt payments to
officers and employees of state-owned customers totaled $4.9
million, and the corrupt payments to officers and employees of
privately-owned customers totaled approximately $1.95 million.
Thus, approximately $6.85 million in total improper payments were
made in approximately 236 payments in over thirty countries and

resulted in net profits to Company A of approximately $46.5
million from the sales related to those corrupt payments.

**COUNT ONE**

**[18 U.S.C. § 371]**

15.   Paragraphs 1 through 14 are realleged and incorporated by reference as though set forth herein.

<u>OBJECTS OF THE CONSPIRACY</u>

16.   Beginning in or around 1998, and continuing through in or around 2007, in the Central District of California, and elsewhere, defendants S. CARSON, R. CARSON, COSGROVE, EDMONDS, RICOTTI, and KIM, as well as Morlok, Covino, Company A and others known and unknown to the Grand Jury, did unlawfully, willfully and knowingly combine, conspire, confederate and agree to commit offenses against the United States, that is,

(A) being a domestic concern and an agent of a domestic concern, to willfully make use of the mails and the means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to any foreign official, and to any person, while knowing that the money or thing of value will be offered, given, or promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his influence with a foreign government and instrumentalities thereof to affect and influence acts and decisions of such government and instrumentalities, in order to assist defendants S. CARSON, R.

9

CARSON, COSGROVE, EDMONDS, RICOTTI, and KIM, as well as Morlok,
Covino, Company A and others known and unknown to the Grand Jury
in obtaining and retaining business for and with, and directing
business to, Company A and others, in violation of Title 15,
United States Code, Section 78dd-2(a); and

     (B) to travel and cause travel in interstate and foreign
commerce and use the mail and any facility in interstate and
foreign commerce, with the intent to promote, manage, establish,
carry on, and facilitate the promotion, management,
establishment, and carrying on of an unlawful activity, that is,
commercial bribery in violation of California Penal Code Section
641.3, and thereafter to perform and attempt to perform and cause
the performance of an act to promote, manage, establish and carry
on, and to facilitate the promotion, management, establishment
and carrying on of such unlawful activity, in violation of Title
18, United States Code, Section 1952(a)(3).

PURPOSE OF THE CONSPIRACY

     17.  The purpose of the conspiracy was to make corrupt
payments to officers and employees of state-owned and private
companies in order to secure and maintain business for Company A.

THE MANNERS AND MEANS OF THE CONSPIRACY

     18.  Defendants S. CARSON, R. CARSON, COSGROVE, EDMONDS,
RICOTTI, and KIM, as well as Morlok, Covino, Company A and others
known and unknown to the Grand Jury employed various manners and
means to carry out the conspiracy, including but not limited to
the following:

     a.     Defendants S. CARSON, R. CARSON, COSGROVE,
EDMONDS, RICOTTI, and KIM, as well as Morlok, Covino, Company A

10

and others known and unknown to the Grand Jury would and did follow a sales model that encouraged Company A salespeople to cultivate FICs, who were typically officers and employees of Company A's state-owned and private customers and who had the authority either to award contracts to Company A or to influence the technical specifications of an order in a manner that would favor Company A.

b.    As part of the cultivation of FICs at Company A's customers, defendants S. CARSON, R. CARSON, COSGROVE, EDMONDS, RICOTTI, and KIM, as well as Morlok, Covino, Company A and others known and unknown to the Grand Jury would and did cause corrupt payments to be made to the FICs in order to secure business.

c.    Defendants S. CARSON, R. CARSON, COSGROVE, EDMONDS, RICOTTI, and KIM, as well as Morlok, Covino, Company A and others known and unknown to the Grand Jury would and did cause the Company A Finance Department to arrange for direct payments to the FICs, payments to the FICs through Company A's representatives and salespeople, and payments to the FICs through Company A's "consultants" who were retained for the purpose of acting as pass-through entities for the improper payments.

d.    Defendants S. CARSON, R. CARSON, COSGROVE, EDMONDS, RICOTTI, and KIM, as well as Morlok, Covino, Company A and others known and unknown to the Grand Jury would and did cause Company A to make corrupt payments to FICs at numerous state-owned entities including, but not limited to, JNPC (China), Guohua Electric Power (China), CPMEC, PetroChina, Dongfang Electric Corporation (China), CNOOC, KHNP, Petronas (Malaysia), and NPCC (United Arab Emirates).

        e.      Defendants S. CARSON, R. CARSON, COSGROVE, EDMONDS, RICOTTI, and KIM, as well as Morlok, Covino, Company A and others known and unknown to the Grand Jury would and did cause Company A to make corrupt payments to FICs at numerous private companies including, but not limited to, Company 1, Company 2, Company 3, Company 4, and Company 5.

        19.  Defendants S. CARSON, R. CARSON, COSGROVE, EDMONDS, and RICOTTI, as well as Covino, Company A and others known and unknown to the Grand Jury would and did participate in and arrange for overseas holidays to places such as Disneyland and Las Vegas for officers and employees of state-owned and private customers under the guise of training and inspection trips.  The actual purposes of the trips were to reward the customers' officers and employees for causing their employers to purchase Company A products, retain current business for Company A, and obtain new business for Company A.

        20.  Defendants S. CARSON and R. CARSON would and did arrange for the purchase of numerous extravagant vacations they took with executives of both state-owned and private customers for the purpose of securing business and charge all expenses, including those of the customers, to Company A.  Such expenses included first-class airfare to destinations such as Hawaii, five-star hotel accommodations, charter boat trips, and similar luxuries.

        21.  Defendants S. CARSON, R. CARSON, and COSGROVE would and did cause Company A to pay the college tuition of the children of at least two executives at Company A's state-owned customers for the purpose of securing business.

22.   Defendants S. CARSON, R. CARSON, COSGROVE, EDMONDS, and RICOTTI, as well as Covino, Company A and others known and unknown to the Grand Jury would and did host and attend lavish sales events to entertain current and potential state-owned and private customers for the purpose of securing business.   Company A paid for a large portion of the costs associated with these events, including hotel costs, meals, greens fees for golf, and travel expenses.

23.   Defendants S. CARSON, R. CARSON, COSGROVE, and EDMONDS and others known and unknown to the Grand Jury would and did give expensive gifts to officers and employees of state-owned and private customers for the purpose of assisting in securing business.

24.   Defendant S. CARSON would and did attempt to halt a 2004 internal audit of commission payments conducted by Company A's parent company.

25.   Defendants R. CARSON, EDMONDS, and KIM, as well as Morlok, Covino, Company A and others known and unknown to the Grand Jury would and did provide false information to internal auditors in connection with Company A's parent company's audit of commission payments, falsely deny that improper payments had occurred, and provide false and misleading responses to the auditors.

26.   Defendant EDMONDS would and did cause the creation of false invoices in an attempt to mislead the internal auditors and to convince the auditors that certain commission payments made to Company A's customers were actually legitimate payments, when defendant EDMONDS knew that the payments were actually improper.

13

27.   Following the internal audit, defendants S. CARSON, COSGROVE, EDMONDS, and RICOTTI, as well as Morlok, Covino and others known and unknown to the Grand Jury would and did continue to encourage and approve improper payments to officers and employees of state-owned and private customers, but would and did instruct Company A employees not to use terms such as "FIC," "flowers," or "special arrangement" in emails.

28.   Defendant EDMONDS would and did cause the preparation of a spreadsheet for the purpose of making it appear that several FIC payments in Korea were legitimate, when defendant EDMONDS knew that the payments were actually improper.

29.   Defendants R. CARSON, COSGROVE, EDMONDS, and RICOTTI, as well as Covino and others known and unknown to the Grand Jury would and did provide false and misleading information to Company A's attorneys in connection with an August 2007 internal investigation into Company A's commission payments, and would and did falsely deny that improper payments had been made.

30.   Defendant R. CARSON would and did destroy documents in connection with Company A's August 2007 internal investigation into Company A's commission payments by, among other things, taking such documents to the Company A ladies' room, tearing up the documents, and flushing them down a toilet.  Defendant R. CARSON would and did continue to flush documents down the toilet even after a representative of the Company A Human Resources Department instructed her to stop doing so.

14

OVERT ACTS

31.   In furtherance of the conspiracy and to achieve its purpose and objects, defendants S. CARSON, R. CARSON, COSGROVE, EDMONDS, RICOTTI, and KIM, as well as Morlok, Covino, Company A and others known and unknown to the Grand Jury committed various overt acts in the Central District of California, and elsewhere, including, but not limited to, the following:

**Corrupt Dealings with JNPC Official**

Overt Act No. 1: In or around February 1999, defendants S. CARSON and R. CARSON held a strategy meeting with other Company A employees concerning the Tianwan Nuclear Power Plant project in China, which was owned by JNPC, a state-owned entity, at which meeting defendants S. CARSON and R. CARSON stated that Company A must cultivate FICs at the customer and mentioned the names of possible FICs.

Overt Act No. 2:  In or around August 1999, defendant R. CARSON arranged for a 2.2% commission to be paid to a purported Chinese "consultant," who was actually an employee of JNPC who had influence in awarding the JNPC contract to Company A.

Overt Act No. 3:  On or about June 9, 2000, defendants S. CARSON and R. CARSON caused Company A to wire approximately $50,000 from its Wells Fargo bank account in California to an account at UBS in Switzerland for the purpose of making a corrupt payment to a JNPC official with regard to the Tianwan Nuclear Power Plant project.

Overt Act No. 4:  On or about July 3, 2000, defendants S. CARSON and R. CARSON caused Company A to wire approximately $50,000 from its Wells Fargo bank account in California to an

account at UBS in Switzerland for the purpose of making a corrupt payment to a JNPC official with regard to the Tianwan Nuclear Power Plant project.

Overt Act No. 5:  On or about July 14, 2000, defendant R. CARSON sent a "confidential" email to other Company A executives stating that "we have already paid them $100,000 so that rest of $100,000 will be pay to them when they stay here."

## Corrupt Dealings with KHNP Officials

Overt Act No. 6:  On or about November 1, 2003, defendant S. CARSON sent an email to defendant KIM stating "Please try very hard to find a Friend in Camp for us on Shin Kori/Wolsong.  Use your contacts, [President of Company A's representative in Korea's, CCI employee's], anybodies, but get us a FIC who can help us win this order.  I'm will to pay big money for a FIC/Consultant."

Overt Act No. 7:  On or about November 4, 2003, defendant KIM wrote a return email to defendant S. CARSON stating "The biggest problem is not the volume of flower or how close we are with those guys.  The problem is the overall climate of KHNP and Korean society.  The former president of KHNP, Mr. [foreign official] who is a good friends of Company A, was fired because he helped some vendors.  Everybody is talking that he must go to jail. . . .  We need a strong guy who can take the risk but there is no one nowadays. . . .  The possibility is not so high but [President of Company A's representative in Korea] and I am still trying very hard to get the consultant."

Overt Act No. 8:  On or about February 12, 2004, Covino sent an email to defendant COSGROVE stating "Paul, I need your

approval on the commission for the Condense Stem Dump valves for Wolsong 3 & 4 valued at $1.8MM (GM: 55%).  Besides what Hanyong is asking, the real situation is as follows: (1) 5% for [Company A's representative in Korea]; (2) 5% for Mr. [foreign official] (KHNP Vice-President) - [Company A's representative in Korea] has already committed; (3) 2% for other three people at site."

Overt Act No. 9:  On or about February 5, 2004, defendant KIM sent an email to a Company A employee indicating that, with regard to the KHNP Wolsong 3 & 4 project, a 5% commission to Company A's representative in Korea was appropriate and that he needed "another 2% for site people."

Overt Act No. 10:  On or about February 12, 2004, defendant COSGROVE approved the payment of a 12% commission on the Wolsong 3 & 4 project, with 5% going to a KHNP Vice President and 2% going to three other employees of KHNP for the purpose of securing KHNP's business with regard to the Wolsong 3 & 4 project in Korea.

Overt Act No. 11:  On or about March 30, 2004, defendant KIM wrote to a Company A salesperson that "[President of Company A's representative in Korea] promised 5% to FIC.  So FIC made a budget and approved it very quickly."

Overt Act No. 12:  On or about September 21, 2004, defendants S. CARSON, COSGROVE and KIM caused Company A to wire a commission payment of approximately $250,200 from its Wells Fargo bank account in California to an account at Citibank in New York for the purpose of making corrupt payments to KHNP officials with regard to the Wolsong 3 & 4 project.

///

17

## Additional Corrupt Dealings with KHNP Officials

Overt Act No. 13:  On or about April 21, 2004, defendants EDMONDS and KIM, as well as Morlok caused Company A to wire a commission payment of approximately $57,658 from its Wells Fargo bank account in California to an account at Industrial Bank in Korea for the purpose of making a corrupt payment to a KHNP official related to the Wolsong and YGN projects in Korea.

Overt Act No. 14:  On or about April 29, 2004, defendants EDMONDS and KIM, as well as Morlok caused Company A to wire a payment of approximately $17,479 from its Wells Fargo bank account in California to an account at Industrial Bank in Korea for the purpose of concealing the corrupt payment to the KHNP official related to the Wolsong and YGN projects in Korea.

Overt Act No. 15:  In or around August 2004, defendant EDMONDS caused the creation of a false invoice that was purportedly from "Power Engineering Company" in the amount of $29,426 to cover up the corrupt payment to the KHNP official related to the Wolsong project in Korea.

Overt Act No. 16:  In or around August 2004, defendant EDMONDS caused the creation of a false invoice that was purportedly from "Namkwang Company" in the amount of $27,747 to cover up the corrupt payment to the KHNP official related to the YGN project in Korea.

## Corrupt Dealings with PetroChina Official

Overt Act No. 17:  On or about March 18, 2004, defendant R. CARSON approved the payment of approximately $15,000 to an official of PetroChina, a Chinese state-owned oil and gas company, for the purpose of securing PetroChina's business with

regard to the Sichuan Natural Gas project in China.

Overt Act No. 18:  On or about April 6, 2004, defendant COSGROVE approved the release of a payment of approximately $15,000 from Company A to an official of PetroChina for the purpose of securing PetroChina's business with regard to the Sichuan Natural Gas project in China.

Overt Act No. 19:  On or about April 13, 2004, defendants R. CARSON and COSGROVE caused Company A to wire a commission payment of approximately $15,000 from its Wells Fargo bank account in California to an account at the Bank of China for the purpose of making a corrupt payment to a PetroChina official with regard to the Sichuan Natural Gas project in China.

### Corrupt Dealings with CPMEC Officials

Overt Act No. 20:  On or about November 10, 2003, a Company A salesperson sent an email to defendant R. CARSON stating, with respect to the sale of a valve on the Kela-2 project to CPMEC, a Chinese state-owned company, that Company A's price was $520,040 and that "the customer marked the price to USD749,040 and required USD229,000 feeded back as consultant fee."

Overt Act No. 21:  On or about November 25, 2003, at defendant R. CARSON'S request, defendant COSGROVE approved the payment of approximately $229,000 from Company A to officials of CPMEC for the purpose of securing CPMEC's business with regard to the Kela-2 project in China.

Overt Act No. 22:  On or about April 20, 2004, defendants R. CARSON and COSGROVE caused Company A to make a cash payment of approximately $2,000 at Los Angeles International Airport to officials of CPMEC for the purpose of securing CPMEC's business

with regard to the Kela-2 project in China.

Overt Act No. 23:  On or about January 20, 2004, defendants R. CARSON and COSGROVE caused Company A to wire a commission payment of approximately $30,000 from its Wells Fargo bank account in California to an account at the Bank of China for the purpose of making a corrupt payment to a CPMEC official with regard to the Kela-2 project in China.

Overt Act No. 24:  On or about October 15, 2004, defendants R. CARSON and COSGROVE caused Company A to wire a commission payment of approximately $100,000 from its Wells Fargo bank account in California to an account at Hang Seng Bank in China for the purpose of making a corrupt payment to a CPMEC official with regard to the Kela-2 project in China.

Overt Act No. 25:  On or about January 14, 2005, defendants R. CARSON and COSGROVE caused Company A to wire a commission payment of approximately $59,005.20 from its Wells Fargo bank account in California to an account at Hang Seng Bank in China for the purpose of making a corrupt payment to a CPMEC official with regard to the Kela-2 project in China.

Overt Act No. 26:  On or about March 1, 2005, defendants R. CARSON and COSGROVE caused Company A to wire a commission payment of approximately $33,706.80 from its Wells Fargo bank account in California to an account at Hang Seng Bank in China for the purpose of making a corrupt payment to a CPMEC official with regard to the Kela-2 project in China.

### Corrupt Dealings with CNOOC Officials

Overt Act No. 27:  On or about December 30, 2003, a Company A salesperson in China sent an email to defendant R. CARSON, as

well as Covino and others with regard to the sale of valves for the Chunxiao Gas Complex Development by Company A to CNOOC, a Chinese state-owned entity, stating "the customer agreed to marked up the price to $250,000, and required $65,000 feedback beside the 2% of the commission. . . . Therefore the total commission is $68,700.  The distribution of this commission as following: $3700 as consultant fee to the Design Institute; $65,000 as commission to the enduser."

Overt Act No. 28:  On or about April 14, 2004, defendant COSGROVE sent an email regarding this project to defendant S. CARSON stating that "Rose says we need to take this for future opportunities I need your approval."

Overt Act No. 29:  On or about April 15, 2004, defendant S. CARSON approved the proposed payment from Company A to an official of CNOOC for the purpose of securing CNOOC's business with regard to the Chunxiao Gas Complex Development in China and future business, stating in an email that "It is my understanding that this job has been delayed by us for 3 months.  I authorize engineering procurement and manufacturing to begin.  I make this authorization based on my agreement that Rose will reduce commissions payable and clean up the T&C's on this job . . . ."

Overt Act No. 30:  On or about April 16, 2004, defendant R. CARSON's assistant sent an email to defendants S. CARSON and COSGROVE, as well as Morlok and others stating "Hereinafter is the message from Rose: The commission included in the contract price is actually what the customer added on our quotation which won't influence our margin. . . . [Company A salesperson in China] - Rose instructed you to explain the details regarding

commission to all the gentlemen on the above email list."

Overt Act No. 31: On or about April 18, 2004, the Company A salesperson explained the arrangement to defendants S. CARSON, R. CARSON and COSGROVE, as well as Morlok by email: "Our final decision price is $185k and including 2% commission. Customer marked up to $250k as final contract price and required the balance feedback as commission, therefore the total commission is $68.7k."

Overt Act No. 32: On or about January 14, 2005, defendants S. CARSON, R. CARSON and COSGROVE, as well as Morlok caused Company A to wire a commission payment of approximately $58,500 from its Wells Fargo bank account in California to a bank account at Hang Seng Bank in China for the purpose of making a corrupt payment to a CNOOC official with regard to the Chunxiao Gas Complex Development in China.

### Corrupt Dealings with NPCC Officials

Overt Act No. 33: On or about April 28, 2005, a Company A salesperson sent an email to defendant RICOTTI stating "Munther called me up today and he wants me to confirm a 5% commission on the OGDIII Chokes job (NPCC), he's got two key FICs within NPCC under his control (including the Project Direct [foreign official]) and deals have to be made now. Out of these 5%, 3% will go to his FICs and 2% to him. I told him that we could commit only 4% at this stage, and if we are not required to reduce our current pricing too much we could increase it back to 5%, he agreed. What do you think, can I proceed?"

Overt Act No. 34: On or about April 28, 2005, defendant RICOTTI sent a reply email to the Company A salesperson stating

"well done and approved" and thereby approved the payment of
$67,791 from Company A to officials of NPCC, a state-owned
petroleum company in the United Arab Emirates ("UAE"), for the
purpose of securing NPCC's business with regard to the OGD III
project in the UAE.

Overt Act No. 35:  On or about April 2, 2007, defendant
RICOTTI caused Company A to wire a commission payment of
approximately $161,413.31 from its Wells Fargo bank account in
California to an account at Arab Bank in the UAE for the purpose
of making corrupt payments to NPCC officials with regard to the
OGD III project in the UAE.

Overt Act No. 36:  On or about April 13, 2007, defendant
RICOTTI caused Company A to wire a commission payment of
approximately $100,000 from its Wells Fargo bank account in
California to an account at Arab Bank in the UAE for the purpose
of making corrupt payments to NPCC officials with regard to the
OGD III project in the UAE.

**Corrupt Dealings with Dongfang Electric Corporation Officials**

Overt Act No. 37:  On or about March 19, 2004, defendant R.
CARSON sent an email to defendants COSGROVE and EDMONDS
requesting approval to pay three officials of Dongfang Electric
Corporation, a Chinese state-owned company, 9% of the total
contract value and an additional $2,000 to each FIC with regard
to the Huizhou, Qianwan, and Shenzhen projects in China.

Overt Act No. 38:  On or about March 24, 2004, defendants
COSGROVE and EDMONDS approved the payment of approximately
$671,695 from Company A to officials of Dongfang Electric
Corporation for the purpose of securing business with regard to

the Huizhou, Qianwan, and Shenzhen projects in China.

Overt Act No. 39:  On or about February 1, 2005, defendants R. CARSON, COSGROVE, and EDMONDS caused Company A to wire a commission payment of approximately $104,539.25 from its Wells Fargo bank account in California to an account at HSBC in China for the purpose of making corrupt payments to Dongfang officials with regard to the Huizhou, Qianwan, and Shenzhen projects in China.

Overt Act No. 40:  On or about February 2, 2005, defendants R. CARSON, COSGROVE, and EDMONDS caused Company A to wire a commission payment of approximately $125,447.10 from its Wells Fargo bank account in California to an account at HSBC in China for the purpose of making corrupt payments to Dongfang officials with regard to the Huizhou, Qianwan, and Shenzhen projects in China.

**Corrupt Dealings with Guohua Electric Power Official**

Overt Act No. 41:  On or about October 19, 2003, defendant COSGROVE, at the request of defendant R. CARSON, approved the payment of approximately $36,146 from Company A to an official of Guohua Electric Power, a Chinese state-owned power company, for the purpose of securing Guohua Electric Power's business with regard to the Taishan II project in China.

Overt Act No. 42:  On or about October 21, 2003, defendants R. CARSON and COSGROVE caused Company A to wire a commission payment of approximately $24,500 from its Wells Fargo bank account in California to an account at Mellon Bank in Pennsylvania to pay the tuition of the Guohua Electric Power official's son, a student at the University of Pennsylvania, for

the purpose of making a corrupt payment to the Guohua Electric Power official with regard to the Taishan II project in China.

Overt Act No. 43: On or about October 21, 2003, defendants R. CARSON and COSGROVE caused Company A to wire a commission payment of approximately $11,646 from its Wells Fargo bank account in California to an account at PNC Bank in Pennsylvania to pay the tuition of the Guohua Electric Power official's son, a student at the University of Pennsylvania, for the purpose of making corrupt payments to the Guohua Electric Power official with regard to the Taishan II project in China.

## Corrupt Dealings with Petronas Official

Overt Act No. 44: On or about November 6, 2003, defendant EDMONDS approved the payment of approximately $98,000 from Company A to an official of Petronas, a Malaysian state-owned petroleum company, for the purpose of securing Petronas' business with regard to the Petronas GPP shutdown project.

Overt Act No. 45: On or about January 6, 2004, defendant EDMONDS caused Company A to wire a commission payment of approximately $98,000 from its Wells Fargo bank account in California to an account at RHB Bank in Malaysia for the purpose of making a corrupt payment to a Petronas official with regard to the Petronas GPP shutdown project.

## Corrupt Dealings with Company 1 Employee

Overt Act No. 46: On or about December 2, 2003, defendant EDMONDS approved the payment of approximately $10,000 from Company A to an employee of Company 1, a private company in China, for the purpose of securing Company 1's business with regard to the Meizhouwan project in China.

Overt Act No. 47:  On or about March 9, 2004, defendant EDMONDS caused Company A to wire a commission payment of approximately $10,000 from its Wells Fargo bank account in California to an account at China Construction Bank in China for the purpose of making a corrupt payment to a Company 1 employee with regard to the Meizhouwan project in China.

### Additional Corrupt Dealings with Company 1 Employee

Overt Act No. 48:  On or about April 5, 2004, defendant EDMONDS approved the payment of approximately $5,000 from Company A to an employee of Company 1 for the purpose of securing Company 1's business with regard to the Meizhouwan project in China.

Overt Act No. 49:  On or about April 25, 2005, defendant EDMONDS caused Company A to wire a commission payment of approximately $5,000 from its Handelsbanken bank account in Sweden to an account at the Bank of China for the purpose of making a corrupt payment to a Company 1 employee with regard to the Meizhouwan project in China.

### Corrupt Dealings with Company 4 Employee

Overt Act No. 50:  On or about May 2, 2003, a Company A employee sent an email to defendant RICOTTI, as well as Covino and others with regard to Company 4, a private engineering procurement company headquartered in Milan, Italy that controlled certain business in connection with the Kashagan Field Development project in Kazakhstan: "Thru a good contact of mine I have been told that we need to make a deal with [employee], Project Procurement Manager [Company 4] . . . . EVERY purchase order will be screened and signed off by [employee]. . . . He is working with a 'bag man' and is looking to take commission on all

1 | major orders."

2 |     Overt Act No. 51:  In or around December 2003, defendant
3 | RICOTTI approved the payment of approximately $69,420 from
4 | Company A to an employee of Company 4 for the purpose of securing
5 | Company 4's business with regard to the Kashagan Field
6 | Development project in Kazakhstan.

7 |     Overt Act No. 52:  On or about December 21, 2006, defendant
8 | RICOTTI caused Company A to wire a commission payment of
9 | approximately $69,420 from its Wells Fargo bank account in
10 | California to an account at Barclays Bank in London for the
11 | purpose of making a corrupt payment to a Company 4 employee with
12 | regard to the Kashagan Field Development project in Kazakhstan.

13 | **Corrupt Dealings with Company 3 Employee**

14 |     Overt Act No. 53:  In or around March 2005, defendant
15 | COSGROVE approved the payment of approximately $163,449 from
16 | Company A to an employee of Company 3, a private company
17 | headquartered in Moscow, Russia, for the purpose of securing
18 | Company 3's business with regard to the SIPAT Thermal Power Plant
19 | in India.

20 |     Overt Act No. 54:  On or about November 29, 2005, defendants
21 | COSGROVE and RICOTTI caused Company A to wire a commission
22 | payment of approximately $26,865 from its Handelsbanken bank
23 | account in Sweden to an account at Dresdner Bank in New York for
24 | the purpose of making a corrupt payment to a Company 3 employee
25 | with regard to the SIPAT Thermal Power Plant in India.

26 |     Overt Act No. 55:  On or about October 24, 2006, defendants
27 | COSGROVE and RICOTTI caused Company A to wire a commission
28 | payment of approximately $136,584.98 from its Handelsbanken bank

account in Sweden to an account at Baltic International Bank in Latvia for the purpose of making a corrupt payment to a Company 3 employee with regard to the SIPAT Thermal Power Plant in India.

### Corrupt Dealings with Company 5 Employee

Overt Act No. 56:  In or around January 2002, defendant RICOTTI approved the payment of approximately $20,045 from Company A to an employee of Company 5, a private company headquartered in Houston, Texas, for the purpose of securing Company 5's business with regard to the Ras Laffan Choke Valves project in Qatar.

Overt Act No. 57:  On or about February 28, 2005, defendant RICOTTI caused Company A to wire a commission payment of approximately $11,800 from its Wells Fargo bank account in California to an account at Qatar National Bank for the purpose of making a corrupt payment to a Company 5 employee with regard to the Ras Laffan Choke Valves project in Qatar.

### Corrupt Dealings with Company 2 Employee

Overt Act No. 58:  On or about July 12, 2003, defendant S. CARSON traveled in interstate commerce, from California to Hawaii, for the purpose of making a corrupt payment to an employee of Company 2, a private company headquartered in San Francisco, California, for the purpose of purchasing a lavish Hawaii vacation for the Company 2 employee to secure future Company 2 business.

### Destruction of Records

Overt Act No. 59:  On or about August 17, 2007, defendant R. CARSON destroyed documents relevant to Company A's August 2007 internal investigation into Company A's commission payments by,

among other things, taking such documents to the Company A
ladies' room, tearing up the documents, and flushing them down a
toilet.

## COUNTS TWO THROUGH TEN

[15 U.S.C. § 78dd-2(a), (g)(2)(A); 18 U.S.C. § 2]

32.  Paragraphs 1 through 31 are realleged and incorporated by reference as though set forth herein.

33.  On or about the dates set forth below, in the Central District of California, and elsewhere, defendants S. CARSON, R. CARSON, COSGROVE, EDMONDS, RICOTTI, and KIM, who were domestic concerns and agents of domestic concerns within the meaning of the FCPA, willfully made use of, and aided, abetted, and caused others to make use of, the mails and the means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to any foreign official, and to any person, while knowing that the money or thing of value will be offered, given, or promised to any foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his influence with a foreign government and instrumentalities thereof to affect and influence acts and decisions of such government and instrumentalities, in order to assist defendants S. CARSON, R. CARSON, COSGROVE, EDMONDS, RICOTTI, and KIM, as well as Morlok, Covino, Company A and others known and unknown to the Grand Jury in obtaining and retaining business for and with, and directing business to, Company A and others, as follows:

30

| COUNT | DEFENDANTS | ON OR ABOUT DATE | INSTRUMENTALITY OF INTERSTATE COMMERCE | INTENDED FOREIGN PUBLIC OFFICIAL BENEFICIARY |
|---|---|---|---|---|
| TWO | S. CARSON COSGROVE KIM | 9/21/2004 | Wire transfer of approximately $250,200 from California to New York | Official(s) at KHNP |
| THREE | EDMONDS KIM | 4/21/2004 | Wire transfer of approximately $57,658 from California to Korea | Official(s) at KHNP |
| FOUR | R. CARSON COSGROVE | 4/13/2004 | Wire transfer of approximately $15,000 from California to China | Official(s) at PetroChina |
| FIVE | R. CARSON COSGROVE | 3/1/2005 | Wire transfer of approximately $33,706.80 from California to China | Official(s) at CPMEC |
| SIX | S. CARSON R. CARSON COSGROVE | 1/14/2005 | Wire transfer of approximately $58,500 from California to China | Official(s) at CNOOC |
| SEVEN | RICOTTI | 4/2/2007 | Wire transfer of approximately $161,413.31 from California to the UAE | Official(s) at NPCC |
| EIGHT | R. CARSON COSGROVE EDMONDS | 2/2/2005 | Wire transfer of approximately $125,447.10 from California to China | Official(s) at Dongfang |
| NINE | R. CARSON COSGROVE | 10/21/2003 | Wire transfer of approximately $24,500 from California to Pennsylvania | Official(s) at Guohua |

| TEN | EDMONDS | 1/6/2004 | Wire transfer of approximately $98,000 from California to Malaysia | Official(s) at Petronas |
| --- | --- | --- | --- | --- |

In violation of Title 15, United States Code, Section 78dd-2, and Title 18, United States Code, Section 2.

32

## COUNTS ELEVEN THROUGH FIFTEEN

### [18 U.S.C. § 1952(a)(3); 18 U.S.C. § 2]

34.   Paragraphs 1 through 31 are realleged and incorporated by reference as though set forth herein.

35.   On or about the dates set forth below, in the Central District of California and elsewhere, defendants COSGROVE, EDMONDS, and RICOTTI did travel in interstate and foreign commerce and use and cause to be used, and aided, abetted, and caused others to make use of, the mail and any facility in interstate and foreign commerce as described below, with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, that is, commercial bribery in violation of California Penal Code Section 641.3, and thereafter performed and attempted to perform and caused the performance of an act to promote, manage, establish and carry on, and to facilitate the promotion, management, establishment and carrying on of such unlawful activity as follows:

33

| COUNT | DEFENDANTS | ON OR ABOUT DATE | FACILITY OF INTERSTATE AND FOREIGN COMMERCE | INTENDED PRIVATE COMPANY BENEFICIARY |
|---|---|---|---|---|
| ELEVEN | EDMONDS | 3/9/2004 | Wire transfer of approximately $10,000 from California to China | Employee(s) at Company 1 |
| TWELVE | EDMONDS | 4/25/2005 | Wire transfer of approximately $5,000 from Sweden to China | Employee(s) at Company 1 |
| THIRTEEN | RICOTTI | 12/21/2006 | Wire transfer of approximately $69,420 from California to the United Kingdom | Employee(s) at Company 4 |
| FOURTEEN | COSGROVE RICOTTI | 10/24/2006 | Wire transfer of approximately $136,584.98 from Sweden to New York | Employee(s) at Company 3 |
| FIFTEEN | RICOTTI | 2/28/2005 | Wire transfer of approximately $11,800 from California to Qatar | Employee(s) at Company 5 |

In violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

34

## COUNT SIXTEEN

### [18 U.S.C. § 1519]

36.   Paragraphs 1 through 31 are realleged and incorporated by reference as though set forth herein.

37.   On or about August 17, 2007, in the Central District of California, defendant R. CARSON did knowingly alter, destroy, mutilate, conceal, and cover up a record, document, and tangible object with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of any department or agency of the United States, or in relation to or contemplation of any such matter or case, by tearing up documents relevant to the investigation and flushing the documents down the toilet in the Company A ladies' room just prior to her interview with Company A's counsel in connection

///
///
///
///
///
///
///
///
///
///
///
///
///
///

35

with Company A's internal investigation into commission payments,

in violation of Title 18, United States Code, Section 1519.

A TRUE BILL

|S|
_____
Foreperson

THOMAS P. O'BRIEN
United States Attorney

CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division

ROBB C. ADKINS
Assistant United States Attorney
Chief, Santa Ana Office

DOUGLAS F. McCORMICK
Assistant United States Attorney
Deputy Chief, Santa Ana Office


STEVEN A. TYRRELL, Chief
MARK F. MENDELSOHN, Deputy Chief
HANK BOND WALTHER, Assistant Chief
ANDREW GENTIN, Trial Attorney
Fraud Section, Criminal Division
U.S. Department of Justice

36