NICOLA T. HANNA, SBN 130694, nhanna@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive, Suite 1200
Irvine, CA 92612
Telephone: (949) 451-3800
Facsimile: (949) 451-4220
Attorneys for Defendant STUART CARSON

KIMBERLY A. DUNNE, SBN 142721, kdunne@sidley.com
SIDLEY AUSTIN LLP
555 W. Fifth Street, Suite 4000
Los Angeles, CA 90013-1010
Telephone: (213) 896-6000
Facsimile: (213) 896-6600
Attorneys for Defendant HONG CARSON

THOMAS H. BIENERT, JR., SBN 135311, tbienert@bmkattorneys.com
BIENERT, MILLER & KATZMAN, PLC
903 Calle Amanecer, Suite 350
San Clemente, CA 92673
Telephone: (949) 369-3700
Facsimile: (949) 369-3701
Attorneys for Defendant PAUL COSGROVE

DAVID W. WIECHERT, SBN 94607, dwiechert@aol.com
LAW OFFICES OF DAVID W. WIECHERT
115 Avenida Miramar
San Clemente, CA 92672
Telephone: (949) 361-2822
Facsimile: (949) 496-6753
Attorneys for Defendant DAVID EDMONDS

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STUART CARSON, et al.,<br><br>Defendants. | CASE NO. SA CR 09-00077-JVS<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS COUNTS ONE THROUGH TEN OF THE INDICTMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br><u>Hearing</u><br>Date:          March 21, 2011<br>Time:          8:00 a.m.<br>Estimated Hearing Length:  90 min. |

Courtroom:    10C
Trial Date:    October 4, 2011
The Honorable James V. Selna

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT on March 21, 2011, at 8:00 a.m., or as soon thereafter as the matter may be heard, in the courtroom of the Honorable James V. Selna, United States District Judge, located at 411 West Fourth Street, Santa Ana, California, Defendants Stuart Carson, Hong "Rose" Carson, Paul Cosgrove, and David Edmonds (collectively "Defendants") will and hereby do move this Court for an order dismissing Counts One through Ten of the Indictment.

The basis for Defendants' Motion is that Counts Two through Ten – the substantive FCPA counts – fail to state an offense.  First, as a matter of statutory interpretation, the employees of the state-owned companies identified in the Indictment – *i.e.*, the supposed recipients of the alleged bribes – fall beyond the scope of the FCPA's definition of "foreign official."  Second, to the extent that there is any ambiguity in the statute, it must be resolved in Defendants' favor through application of the well-established rule of lenity.  Third, in the alternative, to the extent that the FCPA can be construed to proscribe payments made or promised to employees of state-owned companies, the statute is unconstitutionally vague as applied to Defendants.  For these reasons, Counts Two through Ten fail to state an offense and should be dismissed.  Because Count One – the conspiracy count, which alleges a conspiracy to violate the FCPA and the Travel Act – alleges that Defendants conspired to violate the FCPA by bribing these non-foreign officials, that count also must be dismissed because the grand jury may not have indicted Defendants for conspiracy in the absence of the (legally defective) FCPA allegations.

///

///

///

1

This Motion is based on this Notice of Motion, the Memorandum of Points and Authorities filed in support thereof, the Declaration of Professor Michael J. Koehler, the Declaration of Nicola T. Hanna, the Indictment, and such other and further argument and evidence as may be presented to the Court at the hearing of this matter.

Dated:  February 21, 2011                        Respectfully submitted,

                                                 GIBSON, DUNN & CRUTCHER LLP

                                                 By:    s/Nicola T. Hanna
                                                        Nicola T. Hanna

                                                 Attorneys for Defendant STUART CARSON


                                                 SIDLEY AUSTIN LLP

                                                 By:    s/Kimberly A. Dunne
                                                        Kimberly A. Dunne

                                                 Attorneys for Defendant HONG CARSON


                                                 BIENERT, MILLER & KATZMAN, PLC

                                                 By:    s/Thomas H. Bienert, Jr.
                                                        Thomas H. Bienert, Jr.

                                                 Attorneys for Defendant PAUL COSGROVE


                                                 LAW OFFICES OF DAVID W. WIECHERT

                                                 By:    s/David W. Wiechert
                                                        David W. Wiechert

                                                 Attorneys for Defendant DAVID EDMONDS

# TABLE OF CONTENTS

<u>Page</u>

I. INTRODUCTION ................................................................................ 1

II. OVERVIEW OF ARGUMENT ......................................................... 1

III. LEGAL STANDARD ...................................................................... 4

IV. ARGUMENT .................................................................................. 6

    A.    The FCPA Does Not Apply To The Conduct Charged In The Indictment Because, As A Matter Of Law, The Officers And Employees Of State-Owned Companies Are Not "Foreign Officials." ................................................................................... 6

        1.    The Ordinary Meaning Of The Term "Instrumentality" As Used In The FCPA Does Not Encompass State-Owned Business Enterprises ........................................... 11

            a.    Under The Doctrine Of *Noscitur A Sociis*, The Term "Instrumentality" Must Be Construed In Relation To The Terms That Precede It. ............... 12

            b.    Officers And Employees Of State-Owned Companies Could Not Reasonably Be Called "Officials" Of A Foreign Government. ............... 15

            c.    Other Provisions Of The FCPA Make Clear That The Term "Instrumentality" As Used In The FCPA Does Not Include State-Owned Business Enterprises. ................................................ 16

        2.    The Government's Proposed Interpretation Would Lead To Absurd Results. ................................................. 19

        3.    The Legislative History Of The FCPA Demonstrates That Congress Did Not Intend To Include Employees Of State-Owned Business Enterprises Within The Meaning Of "Foreign Official." ................................................. 21

## TABLE OF CONTENTS  *(continued)*

<u>Page</u>

4.    Where Congress Wants To Define "Instrumentality" To Include State-Owned Enterprises, It Knows How To Do So. ................................................................................ 30

5.    The Government's Proposed Interpretation Would Render The Statute Unconstitutionally Vague As Applied To Defendants. .................................................................... 33

B.    Unless The Government's Interpretation Is "Unambiguously Correct," Application Of The Rule Of Lenity Requires Dismissal Of Counts One Through Ten Of The Indictment. ................... 35

C.    In The Alternative, If The Government's Interpretation Of "Instrumentality" Is Correct, Then The Statute Is Unconstitutionally Vague As Applied To Defendants. ........................... 39

V. CONCLUSION ...................................................................... 48

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Bell v. United States,*
349 U.S. 81 (1955)..................................................................37

*Carney v. United States,*
163 F.2d 784 (9th Cir. 1947) ..............................................6

*Company v. United States (In re United States),*
349 F.3d 1132 (9th Cir. 2003) ..........................................14

*Connally v. Gen. Const. Co.,*
269 U.S. 385 (1926)..........................................................4, 39

*Crandon v. United States,*
494 U.S. 152 (1990)..............................................................42

*Dewsnup v. Timm,*
502 U.S. 410 (1992)..............................................................19

*Dole Food Co. v. Patrickson,*
538 U.S. 468 (2003)..............................................................31

*Dole v. United Steelworkers of America,*
494 U.S. 26 (1990)................................................................12

*FCC v. NextWave Personal Communc'ns, Inc.,*
537 U.S. 293 (2003)..............................................................30

*FDIC v. Meyer,*
510 U.S. 471 (1994)..............................................................11

*Forbes v. Napolitano,*
236 F.3d 1009 (9th Cir. 2000) ..........................................40

*Franklin Nat'l Bank v. New York,*
347 U.S. 373 (1954)..............................................................30

*Gates v. Victor Fine Foods,*
54 F.3d 1457 (9th Cir. 1995) ............................................31

*Gustafson v. Alloyd Co.,*
513 U.S. 561 (1995)..............................................................12

*Gutierrez v. Ada,*
528 U.S. 250 (2000)..............................................................13

*In re Grand Jury Subpoena Dated August 9, 2000,*
218 F. Supp. 2d 544 (S.D.N.Y. 2002) ............................16

*INS v. Cardoza-Fonseca,*
480 U.S. 421 (1987)..............................................................27

*Jarecki v. G.D. Searle & Co.,*
367 U.S. 303 (1961)........................................................13, 14

*Kolender v. Lawson,*
461 U.S. 352 (1983)..............................................................41

# TABLE OF AUTHORITIES  *(continued)*

<u>Page(s)</u>

*Liparota v. United States,*
471 U.S. 419 (1985)................................................22

*McBoyle v. United States,*
283 U.S. 25 (1931)......................................4, 39, 40

*Meghrig v. KFC Western, Inc.,*
516 U.S. 479 (1996)................................................30

*Microsoft Corp. v. Comm'r,*
311 F.3d 1178 (9th Cir. 2002) ................................14

*NLRB v Federbush Co.,*
121 F.2d 954 (2nd Cir. 1941) ................................13

*Papachristou v. City of Jacksonville,*
405 U.S. 156 (1972)................................................41

*Public Citizen v. Department of Justice,*
491 U.S. 440 (1989)................................................19

*Rewis v. United States,*
401 U.S. 808 (1971)................................................22

*Russello v. United States,*
464 U.S. 16 (1983)................................................27

*SEC v. Halliburton Company & KBR Inc.,*
Civ. No. 4:09-399 (S.D. Tex.) ................................8

*Shell Oil Co v. Iowa Dept. of Revenue,*
488 U.S. 19 (1988)................................................13

*Skilling v. United States,*
561 U.S. ___, 130 S. Ct. 2896 (2010) ............33, 34, 35, 40, 47

*Smith v. Goguen,*
415 U.S. 566 (1974)................................................41

*Sosa v. Alvarez-Machain,*
542 U.S. 692 (2004)................................................32

*United States v. Alcatel-Lucent, S.A.,*
Crim. No. 10-20907 (S.D. Fla.) ................................8

*United States v. Blondek,*
741 F. Supp. 116 (N.D. Tex. 1990) ........................16

*United States v. Bodmer,*
342 F. Supp. 2d 176 (S.D.N.Y. 2004) ................38, 42

*United States v. Boren,*
278 F.3d 911 (9th Cir. 2002) ................................4

*United States v. Camiel,*
689 F.2d 31 (3d Cir. 1982) ................................6

*United States v. Carpenter,*
933 F.2d 748 (9th Cir. 1991) ................................12

*United States v. Covington,*
395 U.S. 57 (1969)................................................4, 6

iv

# TABLE OF AUTHORITIES  *(continued)*

Page(s)

*United States v. D'Alessio,*
   822 F. Supp. 1134 (D.N.J. 1993).................................................................6

*United States v. Galardi,*
   476 F.2d 1072 (9th Cir. 1973) ...................................................................5

*United States v. Goyal,*
   No. 08-10436, 2010 U.S. App. LEXIS 25223 (Dec. 10, 2010 9th Cir.) ...........47

*United States v. Granderson,*
   511 U.S. 39 (1994).....................................................................4, 19, 35, 38

*United States v. Jin Fuey Moy,*
   241 U.S. 394 (1916).................................................................................41

*United States v. Kellogg Brown & Root LLC,*
   Crim. No. H-09-071 (S.D. Tex.)..................................................................8

*United States v. King,*
   244 F.3d 736 (9th Cir. 2001) ...................................................................12

*United States v. Lanier,*
   520 U.S. 259 (1997).................................................................................40

*United States v. Napier,*
   861 F.2d 547 (9th Cir. 1988) ...................................................................35

*United States v. Panarella,*
   277 F.3d 678 (3d Cir. 2002) .....................................................................5

*United States v. Phillips,*
   367 F.3d 846 (9th Cir. 2004) .....................................................................5

*United States v. Poindexter,*
   951 F.2d 369 (D.C. Cir. 1991) .................................................................39

*United States v. Pride International, Inc.,*
   Criminal No. 10-766 (S.D. Tex. Nov. 4, 2010)..........................................20

*United States v. Saathoff,*
   708 F. Supp. 2d 1020 (S.D. Cal. 2010) ....................................................40

*United States v. Santos,*
   553 U.S. 507 (2008).......................................................11, 22, 36, 37, 38

*United States v. Shortt Accountancy Corp.,*
   785 F.2d 1448 (9th Cir. 1986) ...................................................................4

*United States v. Welch,*
   327 F.3d 1081 (10th Cir. 2003) ...............................................................42

*United States v. Weyhrauch,*
   544 F.3d 969 (9th Cir. 2008) ...................................................................42

*United States v. Williams,*
   553 U.S. 285 (2008).................................................................................13

*United States v. Wiltberger,*
   18 U.S. 76, 5 Wheat. 76 (1820) ...............................................................37

*Whitfield v. United States,*
   543 U.S. 209 (2005).................................................................................30

# TABLE OF AUTHORITIES  *(continued)*

Page(s)

**Statutes**

15 U.S.C. § 78dd-2(a)(1)-(2) .................................................................. 6, 17

15 U.S.C. § 78dd-2(b) .................................................................................. 17

15 U.S.C. § 78dd-2(c)(2)(B) ........................................................................ 18

15 U.S.C. § 78dd-2(h)(2) .................................................................. 7, 16, 40

15 U.S.C. § 78dd-2(h)(2)(B) ........................................................................ 17

15 U.S.C. § 78dd-2(h)(4)(A) ........................................................................ 18

15 U.S.C. § 78m(b)(6) .................................................................................. 32

18 U.S.C § 112 ............................................................................................. 16

18 U.S.C § 116 ............................................................................................. 16

18 U.S.C. § 1839 .......................................................................................... 31

18 U.S.C. § 1956(c)(9) ................................................................................. 38

18 U.S.C. § 2252A(a)(3)(B) ......................................................................... 13

22 U.S.C. § 288 ............................................................................................ 17

28 U.S.C. § 1603(b) ..................................................................................... 31

Pub. L. 105-366, 112 Stat. 3302 (1998) ...................................................... 17

Pub. L. 111-203, 124 Stat. 1376, § 1054 (2010) ........................................ 32

**Other Authorities**

Andrew B. Spalding, *Unwitting Sanctions: Understanding Anti-Bribery Legislation as Economic Sanctions Against Emerging Markets*, Social Science Research Network eLibrary (2009).................................. 25

Christopher J. Duncan, *The 1998 Foreign Corrupt Practices Act Amendments: Moral Empiricism or Moral Imperialism?*, 1 Asian-Pacific L. & Pol'y J. 14 (2000) ........................................................... 45

David A. Gantz, *The Foreign Corrupt Practices Act: Professional and Ethical Challenges for Lawyers*, 14 Ariz. J. Int'l & Comp. L. 97 (1997) ...................................................................................................... 45

James R. Doty, *Toward a Reg. FCPA: A Modest Proposal for Change in Administering the Foreign Corrupt Practices Act*, 62 BUS. LAW. 1233 (2007) ................................................................................................ 45

RALPH H. FOLSOM, MICHAEL W. GORDON, & JOHN A. SPANOGLE, JR., INTERNATIONAL BUSINESS TRANSACTIONS, TRADE AND ECONOMIC RELATIONS (2005) ........................................................................................ 24

Ron Johnstone, *Corporate Counsel: The Top 10 Compliance Tips For The Foreign Corrupt Practices Act*, 71 Tex. B. J. 642 (2008) ......................... 44

# TABLE OF AUTHORITIES  *(continued)*

<u>Page(s)</u>

## Rules

Fed. R. Crim. P. 12(b) ................................................................ 4, 6

Fed. R. Crim. P. 12(d) ................................................................ 4

## Regulations

28 C.F.R. § 80.1 ........................................................................ 42

## Constitutional Provisions

U.S. Const. art. 1, § 8, cl. 3 ...................................................... 25

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

The Indictment in this Foreign Corrupt Practices Act ("FCPA" or "the Act") case does not allege that the Defendants bribed foreign presidents, prime ministers, or princes – or any other foreign officials working within the executive, legislative, or judicial branches of their governments.  Rather, Counts Two through Ten of the Indictment (the substantive FCPA counts) allege only that the Defendants made corrupt payments to officers and employees of "state owned" companies – specifically, those companies' "Vice Presidents, Engineering Managers, General Managers, Procurement Managers, and Purchasing Officers."  Indictment, ¶ 12.  But employees of these *business* enterprises are not "foreign officials" within the meaning of the FCPA, even if the Court accepts as true that the enterprises are "state owned."  Accordingly, Counts Two through Ten of the Indictment fail as a matter of law and must be dismissed.  Additionally, Count One fails and must be dismissed because it alleges a conspiracy to violate the FCPA by bribing these non-foreign officials, and these legally defective allegations infect the entire count.

## II.    OVERVIEW OF ARGUMENT

The anti-bribery provisions of the FCPA prohibit corrupt payments to "foreign official[s]" for the purpose of obtaining or retaining business.  A "foreign official," however, is not *any* foreign national.  Rather, under the FCPA, a "foreign official" is expressly and narrowly defined as an "officer or employee of a foreign government or any department, agency, or instrumentality thereof."  The Government's theory in the present case rests entirely on the unsupported assumption that state-owned companies are "instrumentalities" of foreign governments, and that their employees (even low-level ones) are therefore "foreign officials" within the meaning of the Act.  The Government's sweeping and aggressive interpretation is wrong as a matter of law.

As explained in detail below, the Government's theory  (i) has no basis in the explicit text of the statute, (ii) has no support in the statute's legislative history, and

1

1    (iii) has never been endorsed by a court that comprehensively has considered the issue

2    (including a full consideration of the FCPA's extensive legislative history).  Thus, in

3    bringing this case, the prosecution has stretched the FCPA well beyond its clear textual

4    and intended boundaries and, by so doing, seeks to sweep within its reach conduct that

5    Congress simply has not criminalized.  The Court should reject the Government's

6    attempt to redraw the lines after the fact.  If the Government wants to pursue FCPA

7    prosecutions for alleged bribes made to employees of state-owned business enterprises,

8    it should lobby Congress – not the courts – to criminalize such conduct under the

9    FCPA.

10         The term "instrumentality" is not defined in the Act, but basic canons of

11   statutory construction make clear that the term does not encompass state-owned

12   business enterprises:

13         **First**, in the absence of an express definition, the Court must give the term its

14   ordinary meaning as used in the statute.  As used in the FCPA, the term

15   "instrumentality" refers to a governmental unit or subdivision that is akin to a

16   "department" or an "agency," the two terms that precede it in the statute.  Thus, the

17   term covers governmental boards, bureaus, commissions, and other department-like

18   and agency-like governmental entities.  The definition does not extend, however, to

19   entities in which a government merely has a monetary investment (*i.e.*, state-owned

20   business enterprises), because such a definition would make the term fundamentally

21   different than the terms that precede it.  This conclusion is bolstered by the statute's

22   use of the term "foreign *official*," which suggests a traditional government employee,

23   as well as by language in other portions of the FCPA.

24         **Second**, the Government's proposed interpretation would lead to absurd results.

25   Among other things, if it were adopted, the Government's definition would transform

26   persons no one would consider to be foreign government employees – including but

27   not limited to U.S. citizens working in the United States for companies that have some

28   component of foreign ownership – into "foreign officials."  Additionally, in certain

2

countries where state-owned businesses are the norm, the majority of employed individuals would be "foreign officials."

**Third**, the extensive legislative history of the FCPA makes clear that Congress did not intend the statute to cover payments made to employees of state-owned business enterprises. Rather, the FCPA was aimed at preventing the special harm posed by the bribery of foreign *government* officials.

**Fourth**, as other statutes and proposed legislation make clear, Congress knows how to define the term "instrumentality" in terms of government ownership of a commercial enterprise where it desires to do so. But it did not do so in the FCPA.

**Fifth**, in construing statutes, courts should avoid interpretations resulting in unconstitutional vagueness. Adopting the Government's amorphous and expansive interpretation of "instrumentality" here would result in exactly the type of unconstitutional vagueness that must be avoided. The reason is simple: The Government has never explained with any clarity what constitutes a "state-owned" business in the context of the FCPA. Is a minority investment by a foreign government enough? Is a majority investment required? Must the state direct the majority of voting rights? Is there a required element of control? Does the purpose or type of commercial enterprise matter? Could a subsidiary of a state-owned business qualify? Without a clear demarcation, especially in an era of large-scale government investments and bailouts of traditional private enterprises, the FCPA's reach, under the Government's theory, would be whatever the prosecution says it is in any given case. Accordingly, the Court must construe the FCPA's instrumentality provision narrowly to mean traditional government officials, and not employees of a state-owned (whatever that means) commercial business.

Even if the Court does not conclude that the term "instrumentality" should be construed to refer only to a governmental entity that is innately governmental such as a department or an agency, there are two other grounds on which the Court can and should dismiss Counts One through Ten of the Indictment. First, unless the Court

concludes, after exhausting the canons of statutory construction, that the Government's proposed construction is "unambiguously correct," the Court is *required* to adopt the Defendants' construction under the well-established rule of lenity.  *United States v. Granderson*, 511 U.S. 39, 54 (1994).  Second, if the Court accepts the Government's untethered theory that state-owned companies can constitute government "instrumentalities," and their employees constitute "foreign officials," the statute is unconstitutionally vague as applied to Defendants.  Simply stated, it is well-settled that the Due Process Clause of the United States Constitution requires that "fair warning . . . be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed."  *McBoyle v. United States*, 283 U.S. 25, 27 (1931).  Where a statute employs "terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application," the statute is unconstitutional.  *Connally v. Gen. Const. Co.*, 269 U.S. 385, 391 (1926) (citation omitted).

## III.   LEGAL STANDARD

A defendant may raise, by pretrial motion, any defense "that the court can determine without a trial of the general issue."  Fed. R. Crim. P. 12(b).  A defense is appropriate for pretrial consideration when trial "would be of no assistance in determining [its] validity."  *United States v. Covington*, 395 U.S. 57, 60 (1969); *United States v. Shortt Accountancy Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986) ("A pretrial motion is generally capable of determination before trial if it involves questions of law rather than fact.") (internal quotation marks omitted).  "The court must decide every pretrial motion before trial unless it finds good cause to defer a ruling."  Fed. R. Crim. P. 12(d).

In ruling on a pretrial motion to dismiss an indictment for failure to state an offense, "the court must accept the truth of the allegations in the indictment in analyzing whether a cognizable offense has been charged.  The indictment either states an offense or it doesn't."  *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002)

1   (internal citations omitted).  Importantly, however, even if an indictment alleges each
2   element of an offense, it nonetheless fails when "the specific facts alleged . . . fall
3   beyond the scope of the relevant criminal statute, as a matter of statutory
4   interpretation."  *United States v. Panarella*, 277 F.3d 678, 685 (3d Cir. 2002).  Thus,
5   although the court may not "invade the province of the jury" by deciding *disputed*
6   issues of fact, it can and should resolve before trial any "pure issue of law" that the
7   *undisputed* facts present.  *See United States v. Phillips*, 367 F.3d 846, 855-56 & n.25
8   (9th Cir. 2004) (considering whether, on undisputed facts, a particular creek was a
9   "navigable water" under the Clean Water Act).

10          In the instant case, the substantive FCPA counts (Counts Two through Ten) rest
11   entirely on the *legal conclusion* that each of a number of foreign companies – solely by
12   dint of being state-owned in some fashion[1] – constitutes a "department, agency and
13   instrumentality of a foreign government," and that its officers and employees therefore
14   are deemed "'foreign officials' within the meaning of the FCPA."  Indictment, ¶ 12.
15   But even assuming for purposes of this Motion the truth of the facts alleged in the
16   Indictment, *i.e.*, that each of the  companies at issue had partial or total state
17   ownership, Counts Two through Ten of the Indictment must be dismissed because, *as*
18   *a matter of statutory interpretation*, state-owned enterprises fall beyond the scope of
19   the FCPA's definition of "instrumentality," and their officers and employees therefore
20   cannot be deemed "foreign officials" under the FCPA.

21          Additionally, Count One must be dismissed to the extent it alleges a conspiracy
22   to violate the FCPA by bribing these non-foreign officials.  *See United States v.*
23   *Galardi*, 476 F.2d 1072, 1079 (9th Cir. 1973) ("It should require no citation of

24   _____

25   [1]   The Indictment alleges that each of the following businesses was "state-owned":
     Jiangsu Nuclear Power Corporation ("JNPC") (China), Guohua Electric Power
26   (China), China Petroleum Materials and Equipment Corporation ("CPMEC")
     (China), PetroChina (China), Dongfang Electric Corporation (China), China
27   National Offshore Oil Corporation ("CNOOC") (China), Korea Hydro and
     Nuclear Power ("KHNP") (Korea), Petronas (Malaysia), and National Petroleum
28   Construction Company ("NPCC") (United Arab Emirates).  Indictment, ¶ 12.

authority to say that a person cannot conspire to commit a crime against the United States when the facts reveal there could be no violation of the statute under which the conspiracy is charged.").  And since the legally defective FCPA allegations infect the entire conspiracy count, the count must be dismissed in its entirety.  Where there is a defect in an indictment, a court may identify the flaws in the indictment, but correcting the flaws is beyond the court's power; the court "can neither act for a grand jury, nor speculate whether a grand jury would have indicted the named defendants had it realized that the indictment as written was overbroad."  *United States v. Camiel*, 689 F.2d 31, 39 (3d Cir. 1982); *see also Carney v. United States*, 163 F.2d 784, 790 (9th Cir. 1947) ("neither the trial court nor this court can speculate on the intent of the grand jury").  Where, as here, there is a reasonable possibility that the inclusion of an improper rule of law infected a count in an indictment, the Court must dismiss the count in its entirety.  *See, e.g., United States v. D'Alessio*, 822 F. Supp. 1134, 1145-46 (D.N.J. 1993).

Because trial would be of no assistance in determining the validity of Defendants' *purely legal* arguments, this Motion is appropriate for resolution before trial.  *See* Fed. R. Crim. P. 12(b); *Covington*, 395 U.S. at 60-61.

## IV.   ARGUMENT

**A.    The FCPA Does Not Apply To The Conduct Charged In The Indictment Because, As A Matter Of Law, The Officers And Employees Of State-Owned Companies Are Not "Foreign Officials."**

To violate the anti-bribery provisions of the FCPA, a corrupt payment must be directed to a "foreign official" or a "foreign political party or official thereof or any candidate for foreign political office."  15 U.S.C. § 78dd-2(a)(1)-(2).  The statute defines the term "foreign official" as:

> any officer or employee of a foreign government or any department, agency, or instrumentality thereof, or of a public international organization, or any person acting in an official capacity for or on behalf

6

of any such government or department, agency, or instrumentality, or for or on behalf of any such public international organization.

15 U.S.C. § 78dd-2(h)(2).  Though the term "public international organization" is separately defined, "instrumentality" (like "department" and "agency") is not.

No court has meaningfully construed the term "instrumentality" in the FCPA; in the absence of such case law, the Department of Justice ("DOJ") has liberally pushed the envelope and staked out a maximalist position as to the meaning of the term – a position that finds no support in the express language of the statute, canons of statutory construction, or the legislative history.  Specifically, the Government has baldly asserted that the term "instrumentality," as it appears in the FCPA, includes "state-owned" business enterprises, and that, therefore, all employees of such enterprises – regardless of rank, position, function, or duties – are "foreign officials" within the meaning of the FCPA.  The Government's position was summarized in a written submission to the Organization for Economic Cooperation and Development ("OECD")[2] – a submission the Government was required to prepare as a signatory to the OECD's Convention on Combating Bribery of Foreign Public Officials in International Business Transactions ("the OECD Convention")[3]:

Although the FCPA does not contain an explicit reference to "public enterprises" or any definition thereof, the United States [Government] has consistently applied . . . the FCPA to cover bribery of officials of public enterprises.  State-owned business enterprises may, *in appropriate*

---

[2]   The OECD is a Paris-based international economic organization of 34 countries. "The mission of the OECD is to promote policies that will improve the economic and social well-being of people around the world."  Declaration of Nicola T. Hanna, Exh. A.

[3]   The United States signed the OECD Convention on December 17, 1997.

7

*circumstances*, be considered instrumentalities of a foreign government and their officers and employees to be foreign officials.[4]

*See* Declaration of Nicola T. Hanna ("Hanna Decl."), Exh. B (U.S. Response to OECD Questions Concerning Phase I, at § A.1.1) (emphasis added).

The precise level of ownership the Government believes is necessary to convert a private entity into a foreign governmental entity for the purposes of the FCPA – *i.e.*, what it deems an "appropriate circumstance[]" – is indecipherable and certainly not informed by the language of the statute.  Apparently, however, it is something less than majority ownership, because the DOJ has taken the position in other cases that even entities that are majority-owned by *private parties* may constitute government "instrumentalities" under the FCPA.  Indeed, in recent years, the DOJ and the Securities and Exchange Commission ("SEC") have settled FCPA enforcement actions premised on alleged corrupt payments made to employees of state-owned business enterprises that were demonstrably *only minority-owned* by a foreign government. *See, e.g.*, Hanna Decl., Exh. C (*United States v. Kellogg Brown & Root LLC*, Crim. No. H-09-071 (S.D. Tex.) & *SEC v. Halliburton Company & KBR Inc.*, Civ. No. 4:09-399 (S.D. Tex.)) (alleging bribes paid to "foreign official" officers and employees of Nigeria LNG Limited, which was 49% owned by Nigeria's state-owned oil corporation, Nigerian National Petroleum Corporation[5]); Exh. D (*United States v. Alcatel-Lucent, S.A.*, Crim. No. 10-20907 (S.D. Fla.)) (alleging that officers and

---

[4]   Although the Government has alleged in this case that each of the aforementioned business enterprises was "a department, agency ***and*** instrumentality" of a foreign government, Indictment, at ¶ 12 (emphasis added), there is no basis to assert that any of the entities identified in the Indictment are "departments" or "agencies" of a foreign government.  And indeed, the Government's response to the OECD questionnaire confirms that state-owned businesses, in the Government's view, fall under the FCPA as "instrumentalities."

[5]   Nigeria LNG Limited is jointly owned by Nigerian National Petroleum Corporation (49%), Shell (25.6%), Total LNG Nigeria Ltd (15%) and Eni (10.4%).  *See* Hanna Decl., Exh. E.

8

1   employees of Telekom Malaysia Berhard, which was 43% owned by the Malaysian
2   government, were "foreign officials"[6]).

3        The DOJ's view regarding the reach of the term instrumentality, however,
4   frequently has been questioned by legal commentators and even by the OECD itself.
5   Indeed, the Government's application of the "foreign official" element to employees of
6   public enterprises was identified as a problem area in the OECD's review of the FCPA
7   in 2002:[7]

8        *Another area of potential uncertainty under the FCPA involves officials of*
9        *public enterprises.*   Such enterprises are covered in U.S. law as
10       "instrumentalities", making their officers, directors, employees, etc.,
11       "foreign officials" under the FCPA. *Neither the statute nor its history*
12       *define the term "instrumentality", thus leaving it to U.S. companies to*
13       *determine whether an enterprise is an instrumentality or not.  This can be*
14       *difficult in some cases.*   For instance, are "instrumentalities" only
15       enterprises that are wholly or majority-owned by the foreign government?
16       Does the term "instrumentality" cover enterprises that are controlled by
17       the government, or entities in the process of privatisation?

18   Hanna Decl., Exh. G (OECD's Phase II Report on the U.S.) at ¶ 108 (emphasis added).
19   Despite this persistent questioning, however, no court has ever been presented with a
20   comprehensive history of the FCPA to aid a meaningful ruling on the Government's
21   expansive interpretation.  The reason is simple:  although Congress enacted the FCPA

22   _____

23   [6]   Telekom Malaysia Berhard's largest shareholders are Khazanah Nasional
      Berhad (33.9%), Employees Provident Fund Board (12.15%), and AmanahRaya
24   Trustees Berhad (10.26%).  *See* Hanna Decl., Exh. F.  The DOJ indictment
      alleged that the Malaysian Ministry of Finance owned approximately 43% of
25   Telekom Malaysia's shares.  *See id.*, Exh. D, ¶ 21.

26   [7]   The purpose of the OECD's 2002 review "was to study the structures in place in
      the United States to enforce the laws and regulations implementing the
27   Convention and to assess their application in practice, as well as to monitor the
      United States' compliance in practice with the 1997 Recommendation."  Hanna
28   Decl., Exh. G (OECD's Phase II Report on the U.S.) at ¶ 4.

in 1977, law enforcement activity under the statute largely sat dormant until the early 2000s, and most DOJ and SEC prosecutions historically have involved corporations (not individuals, the prosecution of whom is a relatively recent phenomenon[8]), which tend to resolve such matters expeditiously (whether by way of a plea agreement, deferred prosecution agreement, or otherwise) rather than through lengthy court fights with the Government.  *See* Declaration of Professor Michael J. Koehler ("Koehler Decl."), Exhs. 100-101.  For these reasons, the Government's position has avoided serious judicial scrutiny.

Given the absence of any meaningful case law supporting its expansive interpretation since the advent of the FCPA in 1977, the Government is likely to rely upon two recent orders – one from the Eastern District of Pennsylvania (*United States* v. *Nguyen*) and one from the Southern District of Florida (*United States v. Esquenazi*) – denying  motions to dismiss.  *See* Hanna Decl., Exhs. I & J (attaching orders).  Those orders are not binding on this Court and should be given no weight.  In the *Nguyen* case, the court denied defendants' motion in a one-sentence order that contains no analysis.[9]  And while slightly longer (3 pages), the order in the *Esquenazi* case is equally conclusory and devoid of any substantive analysis.  Neither court was presented with, or considered, the extensive legislative history of the FCPA. Additionally, the defendant in the *Esquenazi* case, who borrowed liberally and haphazardly from the defendants' brief in *Nguyen* (including citing to Third Circuit, rather than Eleventh Circuit, case law and also borrowing facts from *Nguyen* that were

---

[8]   In 2004, the DOJ charged two individuals under the FCPA; in 2005, the DOJ charged five individuals; in 2009 and 2010 combined, the DOJ charged over 50 individuals.  *See* Hanna Decl., Exh. H (Comments of Assistant Attorney General Breuer at the 24th National Conference on the Foreign Corrupt Practices Act (Nov. 16, 2010)); Declaration of Professor Michael J. Koehler, Exh. 100.

[9]   Additionally, after Mr. Nguyen pled guilty, the Court stated at his sentencing that there was insufficient evidence to conclude that the alleged recipient of the bribe was a "foreign official."  *See* Hanna Decl., Exh. K (relevant portions of Sept. 15, 2010 Nguyen sentencing transcript) at 52.

10

1  not applicable to his case) also serially filed at least five other motions to dismiss,

2  some of which  appeared to lack even facial merit (*e.g.*, a motion to dismiss for

3  selective and vindictive prosecution that alleged racism on the Government's part),

4  which may have colored the court's view.  Additionally, the defendants in *Nguyen* and

5  *Esquenazi* made arguments that appeared to hinge on disputed issues of fact, and in

6  both cases the Government argued that the motions were premature.  The present

7  Motion, in contrast, calls for a determination of a purely legal question.  Indeed, for the

8  purpose of deciding Defendants' Motion, the Court can assume that the companies

9  named in the Indictment are 100% state-owned.  Accordingly, despite the perfunctory

10  orders in *Nguyen* and *Esquenazi*, the Court here is presented with an issue of first

11  impression.

12  As discussed in detail below, the Government's position is not supported by the

13  language of the statute and is wrong as a matter of law.  The FCPA's definition of

14  "foreign official" cannot be stretched to encompass employees of state-owned

15  companies.

16  **1.    The Ordinary Meaning Of The Term "Instrumentality" As**

17  **Used In The FCPA Does Not Encompass State-Owned Business**

18  **Enterprises.**

18  The FCPA does not define the term "instrumentality."  Generally, in the absence

19  of a statutory definition, the Court should start with a term's ordinary meaning.  *See*

20  *United States v. Santos*, 553 U.S. 507, 511 (2008) ("When a term is undefined, we give

21  it its ordinary meaning."); *FDIC v. Meyer*, 510 U.S. 471, 476 (1994) (where a term is

22  not defined by statute, "we construe a statutory term in accordance with its ordinary or

23  natural meaning.").  Courts often rely upon dictionary definitions to ascertain a word's

24  "ordinary meaning."  *See, e.g.*, *Santos*, 553 U.S. at 511.  Additionally, "[s]ince context

25  gives meaning," a term must be considered "not in isolation but as it is used in the

26  [relevant] statute."  *Id.* at 512.  This is especially true when the relevant term has

27  multivariate meanings.

28

In the present case, dictionary definitions of "instrumentality" do not shed considerable light on the issue presented to this Court and largely beg the question.[10] As it is "used in the statute," however, the term plainly does not encompass state-owned enterprises.  Rather, the term encompasses governmental units and subdivisions that are akin to departments and agencies.

      a.    **Under The Doctrine Of *Noscitur A Sociis*, The Term "Instrumentality" Must Be Construed In Relation To The Terms That Precede It.**

Under the statutory-construction doctrine of *noscitur a sociis*, a word should be considered in context, particularly if in isolation it would be susceptible of several interpretations.  *See Dole v. United Steelworkers of America*, 494 U.S. 26, 36 (1990) ("words grouped in a list should be given related meaning").  Where a statute presents a "'constructional problem,'" it may be "'resolved by the … principle … that a word is known by the company it keeps (the doctrine of *noscitur a sociis*).'  We have similarly recognized 'that words are to be judged by their context and that words in a series are to be understood by neighboring words in the series.'"  *United States v. King*, 244 F.3d 736, 740 (9th Cir. 2001) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995) and *United States v. Carpenter*, 933 F.2d 748, 750-51 (9th Cir. 1991), respectively) (alterations in original); *cf. Shell Oil Co v. Iowa Dept. of Revenue*, 488 U.S. 19, 25 n.6

---

[10]    For example, "instrumentality" has been variously defined as "a thing used to achieve an end or purpose" (*Black's Law Dictionary* (8th ed. 2004) (def. 1)), "a means; an agency" (*American Heritage Dictionary* (4th ed. 2000) (def. 2)), and "a means or agency through which a function of another entity is accomplished, such as a branch of a governing body" (*Black's Law Dictionary* (8th ed. 2004) (def. 1)).  *See also American Heritage Dictionary* (4th ed. 2000) (def. 3: "A subsidiary branch, as of a government, by means of which functions or policies are carried out."); *Merriam-Webster's Dictionary of Law* (1996) (def. 2: "something that serves as an intermediary or agent through which one or more functions of a larger controlling entity are carried out : a part or branch esp. of a governing body").  Using the first definition of "a thing used to achieve an end or purpose," "instrumentality" standing alone might cover any person or entity hired by a foreign government to accomplish a purpose – including the myriad U.S. corporations and professional firms that are often hired by foreign governments (for example, IBM, Microsoft, and many large accounting and law firms).

12

1   (1988) ("As Judge Learned Hand so eloquently noted: 'Words are not pebbles in alien

2   juxtaposition; they have only a communal existence; and not only does the meaning of

3   each interpenetrate the other, but all in their aggregate take their purport from the

4   setting in which they are used . . . .'") (quoting *NLRB v Federbush Co.*, 121 F.2d 954,

5   957 (2nd Cir. 1941)).  The United States Supreme Court has opined that "[t]he maxim

6   *noscitur a sociis*, . . . while not an inescapable rule, is often wisely applied where a

7   word is capable of many meanings *in order to avoid the giving of unintended breadth*

8   *to the Acts of Congress*."  *Gutierrez v. Ada*, 528 U.S. 250, 255 (2000) (quoting *Jarecki*

9   *v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961)) (emphasis added) (ellipsis in

10  original).

11      Thus, for example, the Supreme Court recently relied on the doctrine of *noscitur*

12  *a sociis* to ascertain the meaning of the words "promotes" and "presents" in the context

13  of a string of operative verbs – "advertises, promotes, presents, distributes, or solicits"

14  – in 18 U.S.C. § 2252A(a)(3)(B).  *United States v. Williams*, 553 U.S. 285 (2008).  The

15  Court observed:

16      When taken in isolation, the … verbs – "promotes" and "presents" – are

17      susceptible of multiple and wide-ranging meanings.  In context, however,

18      those meanings are narrowed by the commonsense canon of *noscitur a*

19      *sociis* – which counsels that a word is given more precise content by the

20      neighboring words with which it is associated.  "Promotes," in a list that

21      includes "solicits," "distributes," and "advertises," is most sensibly read to

22      mean the act of recommending purported child pornography to another

23      person for his acquisition. . . . Similarly, "presents," in the context of the

24      other verbs with which it is associated, means showing or offering the

25      child pornography to another person with a view to his acquisition.

26  553 U.S. at 294-95 (citations omitted).

27      Similarly, the Supreme Court relied upon the doctrine of *noscitur a sociis* to

28  give proper scope to the term "discovery" for purposes of a Tax Code provision that

13

1   afforded special treatment to "[i]ncome resulting from exploration, discovery, or

2   prospecting*."* *Jarecki v. G. D. Searle Co.*, 367 U.S. 303, 305 (1961).  The Court noted

3   that, standing alone, "discovery" could mean many different things; in the statute,

4   however, it "d[id] not stand alone, but gather[ed] meaning from the words around it,

5   [which] … strongly suggest that a precise and narrow application was intended." *Id.* at

6   307.  Faced with a disjunctive list of three terms, the Court considered what industries

7   *all three* terms would apply to: "The three words in conjunction, 'exploration,'

8   'discovery' and 'prospecting,' *all* describe income-producing activity in the oil and gas

9   and mining industries, but it is difficult to conceive of any other industry to which they

10  *all* apply." *Id.*  Thus, the Court found that "application of the maxim [*noscitur a*

11  *sociis*] . . . [led] to the conclusion that 'discovery' in § 456 means only the discovery of

12  mineral resources," and that income from the sales of certain new products did not fall

13  within its ambit.  *Id.*

14          The Ninth Circuit also has relied on the doctrine.  *See, e.g.*, *Microsoft Corp. v.*

15  *Comm'r*, 311 F.3d 1178, 1184-85 (9th Cir. 2002) ("The doctrine of *noscitur a sociis*

16  counsels that words should be understood by the company they keep. … Applying

17  these doctrines, the excluded items … should be understood to have something in

18  common that the excepted copyrights do not."); *Company v. United States (In re*

19  *United States)*, 349 F.3d 1132, 1142 & n.21 (9th Cir. 2003) (applying *noscitur a sociis*

20  and another canon of construction to "confirm[] the meaning of the term 'other person'

21  otherwise suggested by the structure and logic of" 18 U.S.C. § 2518(4)).

22          Here, application of the doctrine of *noscitur a sociis* reveals that the term

23  "instrumentality" should *not* be broadly construed to encompass state-owned

24  enterprises.  Within the FCPA's definition of "foreign official," the term

25  "instrumentality" occurs as the last item in a list – "foreign *government* or any

26  *department*, *agency*, or *instrumentality thereof*." (emphasis added).  "Departments"

27  and "agencies" are subdivisions, units, or organs of a government that carry out

28  functions of the government.  In the United States, by way of example, there is the

14

1  Department of Agriculture and the Environmental Protection Agency.  But

2  governments also have myriad bureaus, boards, administrations, commissions, and the

3  like that also carry out governmental functions.  And in foreign countries, certain

4  governmental subdivisions may go by names – "ministry," for example – that are not

5  used in the United States.  It is these other governmental entities – entities that do not

6  technically fall under the definition of "department" or "agency" but are akin to

7  departments and agencies – that the term "instrumentality" should be construed to

8  cover.[11]  Indeed, when read in this manner, "instrumentality" fits naturally with its

9  statutory neighbors.  In contrast, the Government's proposed reading of

10  "instrumentality" as encompassing any entity in which a government has a monetary

11  investment makes that term fundamentally different from the first three since a

12  business enterprise, regardless of any investment by a foreign government, cannot

13  fairly be said to be carrying out governmental (rather than commercial) functions – at

14  least not in the sense that governmental departments and agencies are carrying out

15  governmental functions.

b.   **Officers And Employees Of State-Owned Companies Could Not Reasonably Be Called "Officials" Of A Foreign Government.**

18  The definition of "instrumentality" as a governmental entity akin to a

19  department or agency is further bolstered by the FCPA's use of the term "foreign

20  *official*."  Employees of a governmental bureau, board, or commission – like

21  employees of the government itself and the government's departments and agencies –

22  could logically be called "officials" of the government.  Indeed, the second part of the

23  definition of "foreign official" refers to "any person acting in an *official capacity* for or

---

[11]  In the United States, the FBI, for example, is neither a "department" nor an "agency" – it is a bureau of the Department of Justice – but it most certainly is an "instrumentality" of the U.S. government.  Other examples of government "instrumentalities" in the United States abound:  the National Transportation Safety Board, the Federal Trade Commission, the National Labor Relations Board, the Securities and Exchange Commission, and the Social Security Administration, among others.

on behalf of any such government or department, agency, or instrumentality."  15

U.S.C. § 78dd-2(h)(2).  But employees of a state-owned company, including the

company's "Vice Presidents, Engineering Managers, General Managers, Procurement

Managers, and Purchasing Officers" (Indictment, ¶ 12), could not reasonably be called

"officials" of a foreign government.  Indeed, if the Government's view were adopted,

even the janitor of a state-owned commercial enterprise would be considered a

"foreign official."  *Cf. In re Grand Jury Subpoena Dated August 9, 2000*, 218 F. Supp.

2d 544, 557 (S.D.N.Y. 2002) (describing the FCPA as involving "foreign public

officials"; "by definition, violations of the FCPA touch upon 'official acts' of

sovereign nations, and every investigation of a suspected violation of the FCPA has the

potential to impugn the integrity of the officials of foreign sovereigns"); *United States

v. Blondek*, 741 F. Supp. 116, 120 (N.D. Tex. 1990) (referring to "foreign officials" as

a "small class of persons" and a "well-defined group").[12]

        **c.**     **Other Provisions Of The FCPA Make Clear That The Term
"Instrumentality" As Used In The FCPA Does Not Include
State-Owned Business Enterprises.**

At least three other portions of the FCPA demonstrate that Congress intended

the term "instrumentality" to refer to a governmental entity comparable to a

"department" or "agency," not to a commercial entity in which the government has an

ownership stake.

First, the structure of the FCPA's anti-bribery provisions plainly is focused on

foreign *public* officials.  In addition to the above discussion regarding the definition of

"foreign official," it is noteworthy that the FCPA was amended in 1998 to add officers

---

[12]  To further illustrate the principle that the term "foreign *official*" would not
logically refer to an employee of a state-owned company, 18 U.S.C. § 1116,
which provides penalties for murder or manslaughter of foreign officials, official
guests, and other internationally protected persons, and 18 U.S.C § 112, which
provides penalties for otherwise harming those persons, both rely on the same
definition of "foreign official," which includes traditional government officials
but not employees of state-owned enterprises.

16

and employees of "*public* international organization[s]" to the definition of "foreign official."  *See* Pub. L. 105-366, 112 Stat. 3302 (1998) (emphasis added).  "Public international organizations" are expressly defined in the statute and are typically large, *intergovernmental* organizations, such as the United Nations and several of its agencies, the World Health Organization, the World Trade Organization, the International Atomic Energy Agency, and the International Monetary Fund, among others.  15 U.S.C. § 78dd-2(h)(2)(B); s*ee also* 22 U.S.C. § 288 ("the term 'international organization' means a public international organization").  Additionally, the FCPA prohibits corrupt payments not only to a "foreign official," but also to "any foreign *political* party or official thereof or any candidate for foreign *political* office."  15 U.S.C. § 78dd-2(a)(2) (emphasis added).  In short, the structure and language of the FCPA demonstrate that the FCPA is aimed at preventing bribery of foreign public officials.  *See also* Hanna Decl., Exh. L (Commentary to Section 2C1.1 of the Federal Sentencing Guidelines Manual, which applies to violations of the FCPA's anti-bribery provisions) ("Such offenses generally involve a payment to a foreign *public* official, candidate for public office, or agent or intermediary, with the intent to influence an *official act or decision of a foreign government* or political party.  Typically, a case prosecuted under these provisions will involve an intent to influence *governmental action*.") (emphasis added).

Second, the FCPA contains an "[e]xception for routine *governmental* action," which provides that the prohibition against making corrupt payments to foreign officials "shall not apply to any facilitating or expediting payment to a foreign official . . . the purpose of which is to expedite or to secure the performance of a routine *governmental* action by a foreign official . . . ."  15 U.S.C. § 78dd-2(b) (emphasis added).  This exception, which is intended to exclude so-called "grease" payments from the scope of the FCPA, defines "routine governmental action" as follows:

> (4) (A)  The  term  'routine  governmental  action'  means  only  an  action which  is  ordinarily  and  commonly  performed  by  a  foreign  official  in—

(i) obtaining permits, licenses, or other official documents to qualify a person to do business in a foreign country;

(ii) processing governmental papers, such as visas and work orders;

(iii) providing police protection, mail pick-up and delivery, or scheduling inspections associated with contract performance or inspections related to transit of goods across country;

(iv) providing phone service, power and water supply, loading and unloading cargo, or protecting perishable products or commodities from deterioration; or

(v) actions of a similar nature.

15 U.S.C. § 78dd-2(h)(4)(A). "Routine *governmental* actions" are performed by employees of governmental departments, agencies, ministries, bureaus, boards, administrations, and commissions – not by employees of state-owned commercial enterprises. Thus, if the Government's expansive interpretation of "instrumentality" were correct, there would be no statutory exception for grease payments made to employees of state-owned enterprises but there would be for payments to traditional government officials. Put another way, under the Government's view, it would be legal to make a grease payment to a traditional government employee, but that same payment to an employee of a state-owned entity would be illegal under the FCPA. Such a convoluted result upsets the FCPA's statutory scheme and is plainly not what Congress intended.

Third, the FCPA contains an affirmative defense where the payment to the foreign official "was a reasonable and bona fide expenditure, such as travel and lodging expenses, incurred by or on behalf of a foreign official . . . and was directly related to— . . .(B) the execution or performance of a contract with a *foreign government or agency thereof*." 15 U.S.C. § 78dd-2(c)(2)(B) (emphasis added). Because this affirmative defense contains no mention of a contract with a foreign "instrumentality," if the term "instrumentality" encompasses state-owned businesses,

18

1  this affirmative defense apparently would not apply if a U.S. company made a payment

2  to an employee of a state-owned company for a bona fide expenditure related to the

3  execution or performance of a contract with the state-owned company.  This again

4  makes no sense.  There is no logical reason that Congress would have made this

5  affirmative defense available when contracts were with foreign government agencies

6  but not when contracts were with state-owned businesses.  It also is possible, if not

7  likely, that the omission of the term "instrumentality" (as well as the term

8  "department") from this affirmative defense was accidental; if so, it only further

9  underscores that Congress viewed "department," "agency," and "instrumentality" as

10  being comparable terms.  In either instance, it is clear Congress was focused in the

11  FCPA on payments to foreign public officials, not employees of commercial

12  enterprises in which a foreign government has an ownership stake.

13      For the foregoing reasons, the term "instrumentality" should be construed to

14  mean a governmental entity that is akin to a department or agency, an interpretation

15  that plainly does not encompass state-owned business enterprises.  Such a reading is

16  consistent with the overall structure of the FCPA itself, including its exceptions and

17  affirmative defenses.

18      ## 2.    The Government's Proposed Interpretation Would Lead To
19      Absurd Results.

20      It is also a well-established maxim of statutory construction that interpretations

21  that lead to absurd results should be rejected.  *See United States v. Granderson*, 511

22  U.S. 39, 47 n.5 (1994) (rejecting an interpretation that "leads to an absurd result");

23  *Dewsnup v. Timm*, 502 U.S. 410, 427 (1992) (Scalia, J., dissenting) ("If possible, we

24  should avoid construing the statute in a way that produces such absurd results.");

25  *Public Citizen v. Department of Justice*, 491 U.S. 440, 454 (1989) ("Where the literal

26  reading of a statutory term would compel 'an odd result,' . . .  we must search for other

27  evidence of congressional intent to lend the term its proper scope.").  Here, the

28

1    Government's expansive reading of "instrumentality" should be rejected for the

2    additional reason that it leads to countless absurd results.

3          First, the Government's reading converts certain U.S. citizens living and

4    working in the United States into "foreign officials."  For example, the Texas-based

5    company CITGO is now – and has been since 1990 – a wholly-owned subsidiary of a

6    Venezuelan-state-owned oil corporation, Petróleos de Venezuela S.A.[13]  *See* Hanna

7    Decl., Exh. M.  As such, under the Government's view, CITGO, which is

8    headquartered in Houston and traces its corporate roots in the United States to 1910, is

9    an "instrumentality" of Venezuela, and all of its Houston-based officers and employees

10   are therefore "foreign officials" of Venezuela.  Similarly, over the past several years,

11   sovereign wealth funds have purchased stakes in U.S. firms such as Citigroup (Abu

12   Dhabi's state investment fund), Morgan Stanley (China Investment Corporation), and

13   the Blackstone Group (China Investment Corporation).  *See* Hanna Decl., Exh. N.  If

14   the Government's view were correct, U.S. employees of those companies have all been

15   transformed into "foreign officials" of Abu Dhabi and China for purposes of the

16   FCPA.  Plainly, the Government's interpretation of "instrumentality" – which allows

17   U.S. citizens living and working in the United States to be transformed into "foreign

18   officials" depending on the shifting winds of ownership of the companies for which

19   they work – is incorrect and must be rejected.[14]

20   _____

21   [13]   In a criminal information filed in November 2010, the DOJ charged Pride
       International, Inc. with FCPA violations arising from bribes paid to an official of
22   Petróleos de Venezuela S.A.  *See United States v. Pride International, Inc.*,
       Criminal No. 10-766 (S.D. Tex. Nov. 4, 2010).
23
       [14]   Under the Government's interpretation, even companies that have shares traded
24   on public stock exchanges can be considered state-owned enterprises.  For
       example, Counts 2 and 3 involve alleged payments to employees of Korea
25   Hydro & Nuclear Power Co. ("KHNP").  KHNP is a wholly-owned subsidiary
       of Korea Electric Power Corp. ("KEPCO").  KEPCO, in turn, is a multi-national
26   energy company and is publicly traded on the New York Stock Exchange and
       other international exchanges.  During the relevant time period, the Korean
27   government, through the Ministry of Knowledge Economy and the state-owned
       Korea Development Bank, owned approximately 54% of KEPCO's shares.
28   Foreign and Korean investors owned the remaining shares. *See* Hanna Decl.,

                                        [Footnote continued on next page]

                                        20

Second, if the Government's view were correct, in this day and age of government bailouts of financial institutions and auto companies, government "instrumentalities" – and thus "foreign officials" – are potentially created every time a government takes an ownership interest in the commercial enterprise being bailed out. Are General Motors and AIG "instrumentalities" of the United States government as a result of the government's ownership stake in them? And if the funds for those bailouts had come not from the United States government but from the Chinese government, would auto workers in Detroit and insurance salespeople in New York be considered Chinese "foreign officials" under the FCPA?[15] Indeed, given the Chinese government's status as the largest investor in United States Treasury obligations, has every federal government employee been transformed into a Chinese foreign official? This is where the "logic" of the Government's position inexorably leads, and it provides yet a further reason why the Government's position must be rejected.[16]

### 3. The Legislative History Of The FCPA Demonstrates That Congress Did Not Intend To Include Employees Of State-Owned Business Enterprises Within The Meaning Of "Foreign Official."

Where the meaning of statutory text is clear, there is no need to resort to legislative history to discern the text's meaning. Where the statutory text is

---

[Footnote continued from previous page]
Exh. O (KEPCO Form 6-K, Notes to Consolidated Financial Statements June 30, 2005 and 2004, p. 1.).

[15] This is not a fanciful question. In fact, one of the new owners of GM following an initial public offering of GM shares on November 18, 2010 is SAIC Motor, GM's partner in China and a company that is owned by the Chinese government." *See* Hanna Decl., Exh. P. Thus, if the Government's view is correct, auto workers in Detroit are already Chinese "foreign officials," which would come as surprising news to them. In fact, because of the U.S. government's investment in GM, the workers are simultaneously U.S. and Chinese government officials under the Government's theory.

[16] Other similar absurdities abound. For example, under the Government's view, virtually every member of the Chinese labor force – almost one-sixth of the world's population – would be a "foreign official" because of the Chinese government's ownership role in most Chinese companies.

21

1  ambiguous, however, courts often look to legislative history to clarify the meaning of

2  the statute.  *See, e.g.*, *Rewis v. United States*, 401 U.S. 808, 812 (1971) (considering

3  first the statutory language, and then the legislative history, to determine the scope of a

4  criminal statute); *Liparota v. United States*, 471 U.S. 419, 424 (1985) (same).[17]  Here,

5  a review of the FCPA's legislative history confirms that Congress did not intend the

6  statute to encompass payments made to employees of state-owned business enterprises.

7       ***First***, there is nothing in the FCPA's legislative history addressing the "any

8  department, agency, or instrumentality" portion of the "foreign official" definition.

9  *See* Koehler Decl. at ¶¶ 16-18.  And there certainly is no express statement or

10  information in the FCPA's legislative history to support the DOJ's expansive legal

11  interpretation that alleged state-owned enterprises are "instrumentalities" of a foreign

12  government and that employees of state-owned enterprises are therefore "foreign

13  officials" under the FCPA's anti-bribery provisions.  *See id.*

14       ***Second***, the FCPA was enacted in 1977 to prevent the recurrence of "severe

15  foreign policy problems" for the United States created by the revelation of multi-

16  million-dollar bribes to high-ranking foreign *government* officials.  *See, e.g.*, Koehler

17  Decl. at ¶¶ 140 (quoting Senate Report No. 94-1031 [Koehler Decl., Exh. 29], at 3),

18  197 (quoting statement of Representative Eckhardt that "bribery of foreign officials"

19  by U.S. corporations creates "severe foreign policy problems") and 243 (quoting H.R.

20  Rep. No. 95-640 (1977) [Koehler Decl., Exh. 46], at 5; *see also id.* at ¶ 222 (quoting

21  Senate Report No. 95-114 [Koehler Decl., Exh. 43], at 3 [noting the "severe adverse

22  effects" of revelations of bribery of foreign government officials]).  Three particular

23  examples were enumerated in the House and Senate Reports accompanying the bills

24  that became the FCPA:

25

26  _____

27  [17]   There is some debate as to the propriety of considering legislative history in
       criminal cases even when the text is *unclear*.  *See Santos*, 553 U.S. at 513 n.3
28  (noting "the question [of] whether resort to legislative history is ever appropriate
       when interpreting a criminal statute").

[I]n 1976, the Lockheed scandal [involving bribes paid to the Prime Minister of Japan, *inter alios*] shook the Government of Japan to its political foundation and gave opponents of close ties between the United States and Japan an effective weapon with which to drive a wedge between the two nations.   In another instance, Prince Bernhardt [the Inspector General of the Dutch Armed Forces and the husband of Queen Juliana] of the Netherlands was forced to resign from his official position as a result of an inquiry into allegations that he received $1 million in pay-offs from Lockheed.   In Italy, alleged payments by Lockheed, Exxon, Mobil Oil, and other corporations to officials of the Italian Government [including the President, Prime Minister, and defense ministers] eroded public support for that Government and jeopardized U.S. foreign policy, not only with respect to Italy and the Mediterranean area, but with respect to the entire NATO alliance as well.

*Id.* at ¶ 243 (quoting H.R. Rep. No. 95-640 [Koehler Decl., Exh. 46], at 5); *see also id*. at ¶ 222 (quoting Senate Report No. 95-114 [Koehler Decl., Exh. OO], at 3 ["Foreign governments friendly to the United States in Japan, Italy, and the Netherlands have come under intense pressure from their own people."]).[18]

Beyond the ethical issues inherent in many kinds of bribery, Congress was concerned about the special harm presented by bribery of foreign *government officials*: "The revelation of improper payments invariably tends to embarrass friendly governments, lower the esteem for the United States among the citizens of foreign nations, and lend credence to the suspicions sown by foreign opponents of the United

---

[18] Time and again the Lockheed scandals were cited as the archexample of the behavior the FCPA was meant to proscribe. *See, e.g.*, Koehler Decl., ¶¶ 76 (quoting Senator Proxmire's statement that "[w]hat we are concerned about is the kind of payment that Lockheed, for example, engaged in…"), 159 (quoting Representative Murphy's reference to the "Lockheed incident" and observing that its "foreign policy implications for the United States are staggering and in some cases, perhaps irreversible"), and 165 (similar).

1   States that American enterprises exert a corrupting influence on the *political* processes

2   of their nations." *Id.* at ¶ 243 (quoting H.R. Rep. No. 95-640 [Koehler Decl., Exh. 46],

3   at 5) (emphasis added).  Congress's perception of this special harm was further

4   informed by the testimony of representatives of the U.S. State Department who were

5   invited to appear before Congress.  *See id.* at ¶ 36 (quoting *The Activities of American*

6   *Multinational Corporations Abroad: Hearings Before the House Subcomm. On*

7   *International Economic Policy of the Comm. on International Relations*, 94th Cong.,

8   1st Sess., 24 (1975) [Koehler Decl., Exh. 4], at 91 [statement of Mark B. Feldman,

9   Deputy Legal Adviser, U.S. Department of State] ["Corruption of friendly foreign

10   governments can undermine the most important objectives of our foreign policy."]);

11   ¶ 64, (quoting *Foreign Payments Disclosure: Hearing Before the Subcomm. on*

12   *Priorities and Economy in Government of the Joint Economic Comm.*, 94th Cong., 2d

13   Sess., 154 (1976) [Koehler Decl., Exh. 8], at 154 [statement of Robert S. Ingersoll,

14   Deputy Secretary of the U.S. Department of State] ["I wish to state for the record that

15   grievous damage has been done to the foreign relations of the United States by recent

16   disclosures. . . . It is a fact that public discussion in this country of the alleged

17   misdeeds of officials of foreign governments cannot fail to damage our relations with

18   these governments."]).

19        Accordingly, the FCPA was designed to eradicate the bribery of foreign

20   *government* officials that had proven to be so corrosive of the United States's foreign

21   policy interests.  *See* H.R. Rep. No. 95-640 [Koehler Decl., Exh. 46], at 5; RALPH H.

22   FOLSOM, MICHAEL W. GORDON, & JOHN A. SPANOGLE, JR., INTERNATIONAL BUSINESS

23   TRANSACTIONS, TRADE AND ECONOMIC RELATIONS (2005) at 392 ("The FCPA is a

24   response to real and perceived harm to U.S. foreign relations with important,

25   developed friendly nations, and the interest of the United States to prevent U.S.

26   persons from making payments which might embarrass the United States in conducting

27   foreign policy."); Andrew B. Spalding, *Unwitting Sanctions: Understanding Anti-*

28   *Bribery Legislation as Economic Sanctions Against Emerging Markets*, Social Science

Research Network eLibrary (2009), at 9 ("Because these [Lockheed] bribes were paid to foreign governments and provoked public outcry in those countries, they were not merely a domestic policy issue; rather, they raised the issue of U.S. relations with foreign countries and the solution would necessarily implicate foreign policy interests. . . . [The FCPA] was in fact widely understood as an instrument of foreign policy, intended to impact relations between the U.S. and other nations, and not merely a component of a domestic ethics crisis.") (citing *The Activities of American Multinational Corporations Abroad: Hearing Before the Senate Comm. on Banking, Housing, and Urban Affairs Concerning Foreign Agents and Foreign Government Officials by the Lockheed Aircraft Corp.*, 94th Cong., 1st Sess., 40-42 (1975) (statement of Sen. Proxmire)). [19]

The goal of preventing the special harm posed by bribery of foreign *government officials* is evident in several features of the FCPA (as originally passed and as amended in 1988 and 1998) – most obviously, in the statute's limitation to bribery of "foreign officials."  Though Congress could have criminalized bribery of any foreign person affecting foreign commerce, *see* U.S. CONST. art. 1, § 8, cl. 3 (granting Congress authority "[t]o regulate commerce with foreign nations"), it chose instead to tailor the FCPA narrowly to the special harm, criminalizing only the bribery of "foreign officials."  Plainly, Congress intended some foreign bribe recipients to fall within the ambit of the Act and others to fall outside of it.  Even if the precise meaning

---

[19] Later Congresses, subsequent to the Ninety-Fifth that passed the FCPA, reaffirmed the primary purpose of the statute.  *See, e.g.*, Koehler Decl. at ¶¶ 300, 301 (noting that in hearings held in 1981 and 1982 to "examine the underlying reasons for the [FCPA], its purposes, the conditions it sought to deal with, and the public policy it sought to achieve,'" "Representative Robert Eckhardt, principal author of FCPA (in the House of Representatives) discussed the Lockheed payments and the fall of the Prime Minister of Japan and implication of the Prince of The Netherlands as being major factors prompting Congress to enact the FCPA" (quoting Hearings Before the Subcommittee on Telecommunications, Consumer Protection, and Finance of the Committee on Energy and Commerce, House of Representatives, 97th Congress, (Sept. 16, Nov. 16, Dec. 16, 1981 and June 8, 1982) [Koehler Decl., Exh. 61], at 3).

of "foreign officials" is not self-evident,  the salient point here is that Congress chose to include such a limitation *at all*, as opposed to creating a general overseas anti-bribery statute.

*Third*, in the legislative history relevant to enactment of the FCPA, the following terms were all used to describe the alleged recipients of certain foreign corporate payments being investigated by Congress: "foreign government official," "foreign public official," and "foreign official."  *See* Koehler Decl. at ¶¶ 16(b), 46.  In many cases, the same sentence or paragraph of congressional testimony or reports contains different combinations of these terms.  *Id.*  It is clear from this legislative history that the terms "foreign government official," "foreign public official" and "foreign official" all refer to the same thing – traditional foreign government officials. *Id.*  The term "foreign official" – the shortest of the three terms commonly used – quickly developed into a short-hand or condensed term to describe traditional foreign government officials throughout the FCPA's legislative history.  *Id.*  In passing the FCPA, Congress intended to prohibit payments to this narrow recipient category of traditional foreign government officials performing official or public functions.  *Id.*

*Fourth*, during its multi-year investigation of foreign corporate payments that preceded adoption of the FCPA, Congress was aware of the existence of state-owned enterprises and that some of the questionable payments uncovered or disclosed may have involved such entities.  *See id.*, ¶¶ 16(c), 149-51, 230-31.  Indeed, in certain of the *competing* bills introduced in Congress to address foreign corporate payments, the definition of "foreign government" expressly included state-owned enterprises.  *Id.*  For instance, in August 1976, S. 3741 was introduced in the Senate and H.R. 15149 was introduced in the House.  *See id.*, ¶¶ 149, 151.  Both bills defined "foreign government" to include, among other things, "a corporation or other legal entity established or owned by, and subject to control by, a foreign government."  *See id.*, ¶¶ 150, 151.  Similarly, in June 1977, H.R. 7543 was introduced in the House.  *See id.*, ¶ 230.  H.R. 7543 defined "foreign government" to include "a corporation or other

26

legal entity established, owned, or subject to managerial control by a foreign government." *See id.*, ¶ 231.

As to S. 3741 and H.R. 15149, an American Bar Association committee informed the Chair of the House subcommittee holding hearings on these bills that the definition of "foreign government" in these bills, specifically the portion of the definition referring to "a corporation or other legal entity established or owned by, and subject to control by, a foreign government" was "somewhat ambiguous." *See id.*, ¶¶ 16(e), 167. The American Bar Association committee suggested a "more precise definition of this aspect of the definition of 'foreign government' and proposed the following language: "a legal entity which a foreign government owns or controls as though an owner." *Id.*

But despite being aware of the existence of state-owned enterprises, despite exhibiting a capability for drafting a definition that expressly included such enterprises in other bills, and despite being provided a more precise way to describe state-owned enterprises, Congress chose not to include such definitions or concepts in S. 305 at all, the bill that ultimately became the FCPA in December 1977. *See id.*, ¶ 16(f). *Cf. INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987) ("Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language."); *Russello v. United States*, 464 U.S. 16, 23-24 (1983) ("Where Congress includes [certain] language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the [omitted text] was not intended.").

**Finally**, the 1988 and 1998 amendments to the FCPA further demonstrate that Congress did not intend to include state-owned business enterprises in the scope of the term "instrumentality."

The FCPA originally defined "foreign official" as:

The term 'foreign official' means any officer or employee of a foreign government or any department, agency, or instrumentality thereof, or any

person acting in an official capacity for or on behalf of any such government or department, agency or instrumentality. ***Such term does not include any employee of a foreign government or any department, agency, or instrumentality thereof whose duties are essentially ministerial or clerical***.

*See* Koehler Decl., ¶ 280 (emphasis added). In 1988, Congress (among other changes it made to the FCPA) removed the last sentence of the definition – which had been included in the original statute as an indirect way to exclude "grease" payments from the scope of the FCPA (*see id*., ¶¶ 282, 310, 313, 348) – and replaced it with the express facilitating payment exception for "routine *governmental* action" now embodied in 15 U.S.C. § 78dd-2(b). *See id*., ¶ 17, 381. As discussed above, the fact that the exception for facilitating payments is tied to "routine *governmental* action" indicates that Congress was focused on payments to foreign *public* officials. *See* Section IV.A.1.c, *supra*.

In 1998, Congress again amended the definition of "foreign official" (among other changes) to implement portions of the 1997 OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions. Importing certain language of the Convention, Congress expanded the definition to include officers and employees of "*public* international organizations," such as the U.N. *See* International Anti-Bribery and Fair Competition Act of 1998, Pub. L. 105-366, 112 Stat. 3302 (Nov. 10, 1998) (emphasis added) [Koehler Decl., Exh. 96]; *see also OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions* [Koehler Decl., Exh. 85].

Importantly, Congress chose *not* to adopt the Convention's definition of "foreign public official," which is defined as "any person holding a legislative, administrative or judicial office of a foreign country, whether appointed or elected; any person exercising a public function for a foreign country, including for a public agency or *public enterprise*; and any official or agent of a public international organization."

*See* Koehler Decl., ¶¶ 17, 386, 395-398 (emphasis added).  The Commentaries on the Convention explicitly define "public enterprise" as:

> any enterprise, regardless of its legal form, over which a government, or governments, may, directly or indirectly, exercise a dominant influence. This is deemed to be the case, *inter alia*, when the government or governments hold the majority of the enterprise's subscribed capital, control the majority of votes attaching to shares issued by the enterprise or can appoint a majority of the members of the enterprise's administrative or managerial body or supervisory board.

*Commentaries, OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions*, at ¶ 14.  The Commentaries go on to state that "[a]n official of a public enterprise shall be deemed to perform a public function unless the enterprise operates on a normal commercial basis in the relevant market, *i.e.*, on a basis which is substantially equivalent to that of a private enterprise, without preferential subsidies or other privileges." *Id.* at ¶ 15.

Congress could have adopted these provisions in the 1998 amendments, but it did not do so.  Thus, while the DOJ takes the (incorrect) position that the term "instrumentality" already implicitly included state-owned enterprises, the fact of the matter is that Congress declined an opportunity to expressly include state-owned enterprises in the statute in 1998.  *See* Koehler Decl., ¶¶ 17, 385-89, 407, 428, 436-37.

As is evident, the Government's expansive reading of "instrumentality" is not supported by the legislative history of the FCPA and, if adopted by this Court, would frustrate Congress's intent by converting the FCPA into a general anti-bribery statute, limited only by the requirement that the entity at issue have some amount of foreign government investment.

### 4. Where Congress Wants To Define "Instrumentality" To Include State-Owned Enterprises, It Knows How To Do So.

The Government's position also should be rejected because Congress knows how to define the term "instrumentality" as a function of government ownership of a commercial enterprise where it desires to do so. It did not do so in the FCPA.

Where a particular element is explicitly set out in one statute, but it is not likewise set out in the statute at issue, courts presume that Congress did not intend to include that element in the statute at issue. *See, e.g.*, *Whitfield v. United States*, 543 U.S. 209, 216 (2005) (Congress has imposed an explicit overt act requirement in 22 conspiracy statutes, yet has not done so in the provision governing conspiracy to commit money laundering); *FCC v. NextWave Personal Communc'ns, Inc.*, 537 U.S. 293, 302 (2003) (when Congress has intended to create exceptions to bankruptcy law requirements, "it has done so clearly and expressly"); *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 485 (1996) ("Congress . . . demonstrated in CERCLA that it knew how to provide for the recovery of cleanup costs, and . . . the language used to define the remedies under RCRA does not provide that remedy"); *Franklin Nat'l Bank v. New York*, 347 U.S. 373, 378 (1954) (finding "no indication that Congress intended to make this phase of national banking subject to local restrictions, as it has done by express language in several other instances").

Where Congress has intended the term "instrumentality" to include state-owned enterprises, it has explicitly so provided. For example, for purposes of the Foreign Sovereign Immunities Act, which was passed one year before the FCPA, the term "'agency or instrumentality of a foreign state' means any entity . . . which is an organ of a foreign state or political subdivision thereof, *or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof*."[20]

---

[20] Remarkably, the definition the Government proposes here for "instrumentality" – an undefined term in the FCPA – is actually *more* expansive than the express definition provided in the Foreign Sovereign Immunities Act, which the

[Footnote continued on next page]

28 U.S.C. § 1603(b) (emphasis added); *see also Dole Food Co. v. Patrickson*, 538 U.S. 468, 476 (2003) (Congress knows how to refer to an "owner" "in other than the formal sense," and did not do so in the Foreign Sovereign Immunities Act's definition of foreign state "instrumentality"); 18 U.S.C. § 1839 (for purposes of the Economic Espionage Act, "the term 'foreign instrumentality' means any agency, bureau, ministry, component, institution, association, or any legal, commercial, or business organization, corporation, firm, or entity that is substantially owned, controlled, sponsored, commanded, managed, or dominated by a foreign government").  That Congress has elsewhere explicitly equated instrumentality status with substantial or majority ownership, but did not do so in the FCPA, indicates that Congress intended the term "instrumentality" in the FCPA to be given its ordinary and most natural reading in context, that is, an entity akin to a government department or agency.

Moreover, it is not the case that the term "instrumentality" is uniformly understood to include state-owned enterprises in congressional enactments even in the absence of a specific definition to that effect.  For example, the three competing bills that were proposed prior to the adoption of the FCPA that defined "foreign government" to include "a corporation or other legal entity established, owned, or subject to managerial control by a foreign government" expressly distinguished this portion of the definition from the portion of the definition that included "a department, agency, or branch of a foreign government."[21]  *See* Koehler Decl., ¶¶ 149-51, 230-31.

---

[Footnote continued from previous page]

Supreme Court has held does *not* extend to subsidiaries of a company that is majority-owned by a foreign state or political subdivision thereof.  *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 473 (2003); *see also Gates v. Victor Fine Foods*, 54 F.3d 1457, 1462 (9th Cir. 1995).  The Government's proposed interpretation of "instrumentality" here has no such limitation, because certain of the foreign companies identified in the Indictment are not themselves state-owned enterprises, but rather are subsidiaries of such enterprises.

[21] In these proposed bills, "branch" appeared in the place of "instrumentality." This further suggests that "instrumentality" was meant to connote a traditional governmental unit or subdivision, like a department or agency.

And to take a more recent example, Section 1504 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, which became law in 2010 and imposes requirements on certain resource extraction issuers to, *inter alia*, disclose information regarding payments made to "foreign governments" for the purpose of the commercial development of oil, natural gas or minerals, also distinguished between a government "instrumentality," on the one hand, and a state-owned enterprise, on the other.  Pub. L. 111-203, 124 Stat. 1376, § 1054 (2010).  Dodd-Frank defines "foreign government" to "include[] a department, agency, or *instrumentality* of a foreign government, *or a company owned by a foreign government*, as determined by the Commission."  *Id.* (emphases added).  If Congress believed the term "instrumentality" to encompass state-owned enterprises without an express definition saying so, the foregoing definition would have been redundant.

Finally, this principle is illustrated by the FCPA itself.  Specifically, because elsewhere in the FCPA Congress employed an explicit "control test" in defining the responsibilities of corporate owners for acts of subsidiaries – but did not employ such a test with respect to government "instrumentalities" – it is evident that Congress did not intend for instrumentality status to turn on government ownership or control.  One of the FCPA's accounting provisions instructs that "[w]here an issuer . . . holds 50 per centum or less of the voting power with respect to a domestic or foreign firm, . . . the issuer [shall] proceed in good faith to use its influence . . . to cause such domestic or foreign firm to devise and maintain a system of internal accounting controls."  15 U.S.C. § 78m(b)(6).  Congress's use of such a control test in the accounting provisions, but not in the anti-bribery provisions' definition of "foreign official" or "instrumentality," suggests that Congress did *not* intend the word "instrumentality" in the anti-bribery provision to cover business entities that are owned or controlled by a government.  *See, e.g., Sosa v. Alvarez-Machain*, 542 U.S. 692, 712 n.9 (2004) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.") (citation

32

omitted).  Had Congress intended "instrumentality" to reach state-owned commercial enterprises, it would have spelled out the standard by which such enterprises would be judged.

### 5.    The Government's Proposed Interpretation Would Render The Statute Unconstitutionally Vague As Applied To Defendants.

Finally, as discussed *infra*, if the Court were to adopt the Government's amorphous interpretation of "instrumentality," the FCPA would be rendered unconstitutionally vague as applied to Defendants.  Where possible, courts should construe statutes in a manner that would not render them unconstitutional.  *See, e.g., Skilling v. United States*, 561 U.S. ___, 130 S. Ct. 2896, 2929 (2010) ("It has long been our practice, however, before striking a federal statute as impermissibly vague, to consider whether the prescription is amenable to a limiting construction.").

The Supreme Court's recent holding in the *Skilling* case is instructive.  There, the Supreme Court was faced with the question of whether the former Enron CEO's conviction for conspiracy to commit, *inter alia*, wire fraud to deprive Enron and its shareholders of "the intangible right of his honest services" in violation of 18 U.S.C. § 1346 was improper, and, if so, whether it was improper because (i) the charged conduct – which did not involve an alleged bribe or kickback – was not, as a matter of law, covered by the honest-services statute, or (ii) the statute was unconstitutionally vague.  Justices Scalia, Thomas, and Kennedy would have overturned Skilling's conviction on the basis that the statute was unconstitutionally vague.  *See* 130 S. Ct. at 2940 (Scalia, J., concurring in part and concurring in the judgment) ("I would . . . reverse Skilling's conviction on the basis that § 1346 provides no 'ascertainable standard' for the conduct it condemns.").  The majority, however, observing that there was some body of conduct that "Congress certainly intended the statute to cover . . .[,] par[ed] that body of precedent down to its core" – and held that Skilling's conduct was not included in the core – in order to preserve the validity of the statute.  *Id.* at 2928.  The Court stated:

33

In view of this history, there is no doubt that Congress intended § 1346 to reach *at least* bribes and kickbacks.   Reading the statute to proscribe a wider range of offensive conduct, we acknowledge, would raise the due process concerns underlying the vagueness doctrine.   To preserve the statute without transgressing constitutional limitations, we now hold that § 1346 criminalizes *only* the bribe-and-kickback core of the pre-*McNally* case law.

*Id.* at 2931 (footnotes omitted).   The Court went on to say that "[h]olding that honest-services fraud does not encompass conduct more wide-ranging than the paradigmatic cases of bribes and kickbacks, we resist the Government's less constrained construction absent Congress' clear instruction otherwise. . . .   If Congress desires to go further, we reiterate, it must speak more clearly than it has."   *Id.* at 2933 (citations and internal quotation marks omitted).

The applicability of *Skilling* to the present case is clear.   Congress plainly had a "core" of "foreign officials" in mind when it enacted the FCPA.   The legislative history reveals that the core included presidents, prime ministers, princes, and other traditional *government* officials.   Interpreting "instrumentality" to mean a governmental subdivision akin to a department or agency (*e.g.*, a board, a bureau, a commission, and so on) keeps that core of foreign officials intact and preserves the heartland and constitutionality of the statute.   But if the government's expansive, untethered, and standardless interpretation of "instrumentality" is accepted by the Court, the statute will be rendered unconstitutionally vague (as discussed at greater length, *infra*).   Like the Supreme Court in *Skilling*, this Court should avoid invalidating the statute by rejecting the government's proposed interpretation.   To borrow from the

language of the *Skilling* court, "[i]f Congress desires to go further . . . it must speak more clearly than it has." *Id.*[22]

**B.   Unless The Government's Interpretation Is "Unambiguously Correct," Application Of The Rule Of Lenity Requires Dismissal Of Counts One Through Ten Of The Indictment.**

For all of the reasons just described, the Court should find that, as a matter of law, the word "instrumentality" as used in the FCPA cannot be stretched so far as to include state-owned companies.  But Defendants do not have to show that their position is unquestionably correct in order to succeed with the instant Motion.  Rather, it is the Government's position that must be proven "*unambiguously correct*" in order for the charges against Defendants to stand.  *See United States v. Granderson*, 511 U.S. 39, 54 (1994) ("[W]here text, structure, and history fail to establish that the Government's position is unambiguously correct," the court must "apply the rule of lenity and resolve the ambiguity in the defendant's favor.").

To the extent that there is any ambiguity in the term "instrumentality," that ambiguity must be resolved in Defendants' favor by application of the rule of lenity. *See id.*; *Skilling*, 130 S. Ct. at 2905-06 (invoking the "principle that ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity") (citation and internal quotation marks omitted); *United States v. Napier*, 861 F.2d 547, 548-49 (9th Cir. 1988) ("It has long been settled that penal statutes are to be construed strictly, and that one is not to be subjected to a penalty unless the words of the statute

---

[22] Unsurprisingly, the DOJ already is lobbying Congress to respond to the Supreme Court's decision in *Skilling* by amending the honest-services statute. Assistant Attorney General Lanny A. Breuer explained the DOJ's position at a congressional hearing last September.  Among other things, he noted that "in order to follow the Supreme Court's direction in *Skilling* that any legislation in this area provide notice to citizens as to what conduct is prohibited, the statute should be clear and specific."  *See* Hanna Decl., Exh. Q.  If this Court concludes, as it should, that the term "instrumentality" in the FCPA does not encompass state-owned commercial enterprises, the DOJ can similarly lobby Congress to have the statute amended to provide "clear and specific" "notice to citizens as to what conduct is prohibited."  This is not unfair, but rather is precisely what the Constitution contemplates, and indeed, requires.

1   plainly impose it.  This principle is founded on the sound policy that before criminal

2   penalties can be imposed fair warning should be given to the world in language that the

3   common world will understand, of what the law intends to do if a certain line is

4   passed.") (internal quotation marks and citations omitted).  "This venerable rule not

5   only vindicates the fundamental principle that no citizen should be held accountable

6   for a violation of a statute whose commands are uncertain, or subjected to punishment

7   that is not clearly prescribed.  It also places the weight of inertia upon the party that

8   can best induce Congress to speak more clearly and keeps courts from making criminal

9   law in Congress's stead."  *Santos*, 553 U.S. at 514.

10      The Supreme Court recently undertook an in-depth examination of the lenity

11  doctrine in *United States v. Santos*.  That case turned on whether the word "proceeds"

12  in a federal money-laundering statute meant "receipts," as the Government contended,

13  or "profits," as defendant contended.  The Court found, first, that both meanings were

14  consistent with ordinary usage and dictionary definitions.  553 U.S. at 512.  Second,

15  either meaning would make sense in context; that is, the statute's provisions would

16  make sense using either "profits" or "receipts" in place of the word "proceeds."  *Id.*

17  The Court thus concluded:

18          Under either of the word's ordinary definitions, all provisions of the

19          federal money-laundering statute are coherent; no provisions are

20          redundant; and the statute is not rendered utterly absurd.  From the face of

21          the statute, there is no more reason to think that "proceeds" means

22          "receipts" than there is to think that "proceeds" means "profits."  Under a

23          long line of our decisions, the tie must go to the defendant.  The rule of

24          lenity requires ambiguous criminal laws to be interpreted in favor of the

25          defendants subjected to them. . . . Because the "profits" definition of

26          "proceeds" is always more defendant-friendly than the "receipts"

27          definition, the rule of lenity dictates that it should be adopted.

28  *Id.* at 513-14 (citations omitted).

36

The *Santos* Court's rejection of the Government's appeal to Congressional intent is particularly instructive.  The Government argued, first, that the defendant's proffered interpretation "fail[ed] to give the federal money-laundering statute its proper scope and . . . hinder[ed] effective enforcement of the law."  *Id.* at 514.  The Government argued that "if [the Court did] not read 'proceeds' to mean 'receipts,' [it would] disserve the purpose of the federal money-laundering statute, which is, the Government [said], to penalize criminals who conceal or promote their illegal activities."  *Id.*

The Supreme Court rejected this argument out of hand, calling it "a textbook example of begging the question":

> To be sure, if "proceeds" meant "receipts," one could say that the statute was aimed at the dangers of concealment and promotion.  But whether "proceeds" means "receipts" is the very issue in the case.  If "proceeds" means "profits," one could say that the statute is aimed at the distinctive danger that arises from leaving in criminal hands the yields of a crime.

*Id.* at 515.  Either one might have been the purpose of a "rational Congress."  *Id.*  But, the plurality said, "[w]hen interpreting a criminal statute, we do not play the part of a mind reader."  *Id.*  Quoting Chief Justice Marshall's opinion in the "seminal rule-of-lenity decision," the plurality said: "'[P]robability is not a guide which a court, in construing a penal statute, can safely take.'"  *Id.* (quoting *United States v. Wiltberger*, 18 U.S. 76, 5 Wheat. 76 (1820)) (alterations in original).  The Court also cited Justice Frankfurter: "'When Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity.'"  *Id.* (quoting *Bell v. United States*, 349 U.S. 81, 83 (1955)).

Second, the Government argued that the Court should adopt its "'receipts' interpretation because – quite frankly – it is easier to prosecute," as it would lessen the Government's evidentiary burden.  *Santos*, 553 U.S. at 519.  "Essentially," the Court said, "the Government asks us to resolve the statutory ambiguity in light of Congress's

37

presumptive intent to facilitate money-laundering prosecutions." *Id.* The Court flatly rejected this position, which "turns the rule of lenity upside-down. We interpret ambiguous criminal statutes in favor of defendants, not prosecutors."[23] *Id.*

This Court would not be the first Court to dismiss an FCPA indictment on lenity grounds. In *United States v. Bodmer*, 342 F. Supp. 2d 176 (S.D.N.Y. 2004), the court dismissed part of an indictment on lenity grounds in an FCPA case. Having considered the plain meaning of the words of the statute and the relevant legislative history (and observing that there were no judicial decisions interpreting the relevant portion of the FCPA, and that "[t]he Government's charging decision, standing alone, does not establish the applicability of the statute," 342 F. Supp. 2d at 187 n.10) the *Bodmer* court found that it was unclear whether prior to the 1988 FCPA amendments, certain foreign nonresident nationals could be prosecuted under the FCPA. *See id.* at 181-89. Accordingly, the *Bodmer* court dismissed the portion of the indictment charging the defendant with conspiracy to violate the FCPA. *See id.* at 189.

Applying these principles to the present case, to the extent that there is any ambiguity in the term "instrumentality," that ambiguity must be resolved in Defendants' favor by application of the rule of lenity. *See Granderson*, 511 U.S. at 54 (1994) ("[W]here text, structure, and history fail to establish that the Government's position is unambiguously correct," the court must "apply the rule of lenity and resolve the ambiguity in [the defendant's] favor."). The Government cannot show that its position as to the scope of the term "instrumentality" is "unambiguously correct."

---

[23] Following the *Santos* decision, Congress amended the federal money-laundering statute to expressly define "proceeds," which was previously undefined in the statute, as "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, *including the gross receipts of such activity.*" 18 U.S.C. § 1956(c)(9) (emphasis added). This amendment supported Justice Scalia's observation in *Santos* that the rule of lenity "places the weight of inertia upon the party that can best induce Congress to speak more clearly and keeps courts from making criminal law in Congress's stead." *Santos*, 553 U.S. at 514. Similarly, if the current Congress intends for the definition of "instrumentality" in the FCPA to include state-owned enterprises, it can and should amend the statute to state and define that expressly.

38

Indeed, in light of (i) the ordinary meaning of the word "instrumentality" as used in the FCPA (ii) the absurd results that would flow from the Government's interpretation, (iii) the legislative history showing that Congress did not intend to create a general anti-bribery statute but was concerned with the special harm posed by bribery of foreign government officials, (iv) the fact that Congress knows how to include state-owned or state-controlled business enterprises in the definition of "instrumentality" when it wants to do so but did not do so in the FCPA, and (v) the fact that the Government's proposed interpretation would render the statute unconstitutionally vague, it would be impossible to say with certainty that Congress intended employees of state-owned business enterprises to be deemed "foreign officials." The statute, at best, is ambiguous. Accordingly, even in the best case for the Government, the rule of lenity applies and compels the dismissal of counts One through Ten of the Indictment.

**C.    In The Alternative, If The Government's Interpretation Of "Instrumentality" Is Correct, Then The Statute Is Unconstitutionally Vague As Applied To Defendants.**

If the Government is correct that employees of state-owned business enterprises constitute "foreign officials," then the FCPA as applied here is unconstitutional for using "terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. Gen. Const. Co.*, 269 U.S. 385, 391 (1926) (citation omitted); *accord United States v. Poindexter*, 951 F.2d 369, 378 (D.C. Cir. 1991) ("[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.").

The Due Process Clause of the United States Constitution requires that "fair warning . . . be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *McBoyle v. United States*, 283 U.S. 25, 27 (1931). "To satisfy due process, a penal statute [must] define the criminal offense [1] with sufficient definiteness that ordinary people can understand

1   what conduct is prohibited and [2] in a manner that does not encourage arbitrary and

2   discriminatory enforcement.  The void-for-vagueness doctrine embraces these

3   requirements." *Skilling*, 130 S. Ct. at 2927-28 (citation and internal quotation marks

4   omitted); *see also Forbes v. Napolitano*, 236 F.3d 1009, 1011 (9th Cir. 2000) ("If a

5   statute subjects transgressors to criminal penalties . . . vagueness review is even more

6   exacting.  In addition to defining a core of proscribed behavior to give people

7   constructive notice of the law, a criminal statute must provide standards to prevent

8   arbitrary enforcement.") (citations omitted).  While there is an inherent limit to the

9   precision with which statutes can be drafted, "so far as possible the line should be

10  clear." *McBoyle*, 283 U.S. at 27.  Moreover, "statutes should not be written so as to be

11  understood by judges, legislators, lawyers, and law professors, but for the citizens

12  against whom they may one day be applied." *United States v. Saathoff*, 708 F. Supp.

13  2d 1020, 1023 (S.D. Cal. 2010).  The "touchstone" of fair warning is whether it was

14  "reasonably clear at the relevant time" that a defendant's conduct was criminal under

15  "the statute, either standing alone or as construed." *United States v. Lanier*, 520 U.S.

16  259, 267 (1997).

17       As noted, no court has ever thoroughly considered the "foreign official"

18  provision of the FCPA.  The language seems clear enough on its face as a prohibition

19  against the bribery of officials of a foreign government or a department, agency, or

20  other similar political subdivision thereof.  But the question for the Court is whether it

21  is "reasonably clear" from the face of the FCPA that employees of state-owned

22  business enterprises also constitute "foreign officials." *See Lanier*, 520 U.S. at 267.

23  The answer is "no."  Defendants respectfully submit that few ordinary citizens would

24  ever imagine that, to take an extreme example, a gas station attendant at their local

25  CITGO station might be considered an "officer or employee of a foreign government

26  or any department, agency, or instrumentality thereof." *See* 15 U.S.C. § 78dd-2(h)(2).

27  At best, one could only hazard a guess as to whether a gasoline company might

28  constitute a government "instrumentality."  But citizens should not be required to

1  guess whether their conduct violates a criminal statute.  Thus, while the plain language

2  of the FCPA is clear enough in context, the Government's forcing of an overbroad

3  gloss on the language renders it unclear.[24]

4      Additionally, the Government's refusal (or inability) to take a meaningful

5  position on exactly when the Government will consider a state-owned enterprise to be

6  a government "instrumentality" – the Government says only that "[s]tate-owned

7  business enterprises may, *in appropriate circumstances*, be considered

8  instrumentalities of a foreign government" (*see* pp. 7-8, *supra*) (emphasis added), but it

9  never defines what those "appropriate circumstances" are – unquestionably encourages

10  arbitrary and discriminatory enforcement of the statute.  *See, e.g., Kolender v. Lawson*,

11  461 U.S. 352, 361 (1983) ("We conclude § 647(e) is unconstitutionally vague on its

12  face because it encourages arbitrary enforcement by failing to describe with sufficient

13  particularity what a suspect must do in order to satisfy the statute."); *Smith v. Goguen*,

14  415 U.S. 566, 575, 581-82 (1974) (holding that a Massachusetts flag-misuse statute

15  was unconstitutionally vague because the legislature was fully capable of "defining

16  with substantial specificity what constitute[ed] forbidden treatment of United States

17  flags," and "[s]tatutory language of such a standardless sweep allow[ed] policemen,

18  prosecutors, and juries to pursue their personal predilections"); *Papachristou v. City of*

19  *Jacksonville*, 405 U.S. 156, 170 (1972) (holding a vagrancy ordinance void for

20  vagueness and stating that "[w]here, as here, there are no standards governing the

21  exercise of the discretion granted by the ordinance, the scheme permits and encourages

22  an arbitrary and discriminatory enforcement of the law").

23      Even if the DOJ's own position were controlling – which of course it is not[25] – it

24  is not sufficiently clear to provide "fair warning."  First, in a document ostensibly

---

25      [24]  As discussed above, the Court can avoid invalidating the statute by rejecting the
26  Government's overbroad definition and adopting Defendants' definition, a
   construction that raises no fair warning issues.  *See* Section IV.5, *supra*.  *See*
27  *also United States v. Jin Fuey Moy*, 241 U.S. 394, 401 (1916) ("A statute must
   be construed, if fairly possible, so as to avoid not only the conclusion that it is
28  unconstitutional but also grave doubts upon that score.").

created to provide guidance to laypersons, "The Lay-Person's Guide [to the FCPA]," which is available on the DOJ's website, the DOJ offers a definition of "foreign official" that provides no guidance for if or when the DOJ will consider an employee of a state-owned enterprise to be a "foreign official":

> The prohibition extends only to corrupt payments to a foreign official, a foreign political party or party official, or any candidate for foreign political office.  A 'foreign official' means any officer or employee of a foreign government, a public international organization, or any department or agency thereof, or any person acting in an official capacity.

Hanna Decl., Exh. R (*Lay-Person's Guide to FCPA*), at §D, *available at* http://www.usdoj.gov/criminal/fraud/docs/dojdocb.html).  About employees of state-owned enterprises, the Guide says only, "You should consider utilizing the Department of Justice's Foreign Corrupt Practices Act Opinion Procedure for particular questions as to the definition of a 'foreign official,' such as whether a member of a royal family, a member of a legislative body, or an official of a state-owned business enterprise would be considered a 'foreign official.'"[26]  *Id.*  The United States Attorneys' Manual, a reference tool for federal prosecutors that provides official guidance on DOJ policies, *see United States v. Weyhrauch*, 544 F.3d 969, 973 (9th Cir. 2008), describes the reach of the FCPA in the same terms: "The [anti-bribery] prohibition extends only to corrupt

---

[Footnote continued from previous page]

[25]   *See, e.g., United States v. Bodmer*, 342 F. Supp. 2d 176, 187 n.10 (S.D.N.Y. 2004) ("The Government's charging decision, standing alone, does not establish the applicability of the statute.").  *See also United States v. Welch*, 327 F.3d 1081, 1092-93 (10th Cir. 2003) ("We 'have never thought that the interpretation of those charged with prosecuting a criminal statute is entitled to deference.") (citing *Crandon v. United States*, 494 U.S. 152, 177 (1990)).

[26]   The FCPA Opinion Procedure "enable[s] issuers and domestic concerns to obtain an opinion of the Attorney General as to whether certain specified, prospective – not hypothetical – conduct conforms with the Department's present enforcement policy regarding the antibribery provisions of the [FCPA]." 28 C.F.R. § 80.1.

payments made, directly or indirectly, to a foreign official, a foreign political party or party official, or any candidate for foreign public office. A 'foreign official' means any officer or employee of a foreign government, a public international organization, or any department or agency thereof, or any person acting in an official capacity." *See* Hanna Decl., Exh. S (U.S. Dep't of Justice, United States Attorneys' Manual, tit. 9, Criminal Resources Manual 1018 (1997)).[27]

Second, as discussed above, in a submission to the OECD – available on the DOJ website but not directed at laypersons – the Government raises the possibility of its considering a state-owned business to be an "instrumentality" "in appropriate circumstances," but fails to spell out with any clarity what those circumstances are.[28] *See* Hanna Decl., Exh. B. For these reasons, the OECD criticized the Government's position as creating "potential uncertainty." Hanna Decl., Exh. G.

Third, to the extent the Government has provided some indication of the criteria it apparently will consider in determining whether, in its view, a state-owned business enterprise qualifies as a government "instrumentality" for purposes of the FCPA, it has given mixed and conflicting signals. For example, at times the Government has stated that it will consider the "local law" of the foreign state in determining instrumentality status:

> State-owned business enterprises may, in appropriate circumstances, be
> considered instrumentalities of a foreign government and their officers

---

[27] Another document available on the DOJ's website, titled "Proposed Legislative History, International Anti-Bribery Act of 1988," states that "the FCPA required both issuers and all other U.S. nationals and companies (defined as domestic concerns') to refrain from making any unlawful payments to *public officials*, political parties, party officials, or candidates for public office . . . ." Hanna Decl., Exh T (emphasis added).

[28] Under the Government's view, the onus to determine whether a foreign company constitutes a state-owned enterprise sufficient to render it an "instrumentality" is on the U.S. company doing business overseas. Without clear guidance from the Government as to what elevates a foreign commercial enterprise to "instrumentality" status, however, this is a difficult, if not impossible, task.

43

and employees to be foreign officials.  The Department of Justice . . . has not adopted a bright-line test for determining which enterprises are instrumentalities.  Among the factors that it considers are the foreign state's own characterization of the enterprise and its employees, *i.e.*, whether it prohibits and prosecutes bribery of the enterprise's employees as public corruption, the purpose of the enterprise, and the degree of control exercised over the enterprise by the foreign government.

*See* Hanna Decl., Exh. B (U.S. Response to OECD Questions Concerning Phase I, at § A.1.1); *see also* Hanna Decl., Exh. U (FCPA Opinion Procedure Release No. 10-03) (concluding that a consultant that was a "registered agent of a foreign government" did not qualify as a "foreign official" under the disclosed facts and relying in part on local law to reach this conclusion; "As a matter of law local, the Consultant and its employees are not employees or otherwise officials of the foreign government, and the Requestor has secured a local law opinion that it is permissible for the Consultant to represent both the foreign government and the Requestor at the same time.").  At other times, however, the Government has indicated that it will consider employees of state-owned enterprises to be "foreign officials" even where under the local law such persons were *not* considered government employees.  *See, e.g.*, Hanna Decl., Exh. V (FCPA Opinion Procedure Release No. 94-01) ("The American company's foreign attorney has advised that under the nation's law, the individual would not be regarded as either a government employee or a public official, the foreign attorney's opinion is not dispositive, and we have considered the foreign individual to be a 'foreign official' under the statute.").

In addition to the OECD, many commentators have noted the vagueness of the "foreign official" definition in particular, as well as the vagueness of the FCPA generally.  *See* Ron Johnstone, *Corporate Counsel: The Top 10 Compliance Tips For The Foreign Corrupt Practices Act*, 71 Tex. B. J. 642 (2008) ("Setting aside the clear-cut cases (e.g., foreign government legislators, ministers, and employees), *the FCPA's*

44

1   *foreign official definition . . . is quite vague.*  Such vagueness has the dual effect of 1)

2   giving the DOJ and SEC plenty of enforcement discretion/wiggle room, and 2) making

3   it difficult for U.S. companies to provide their employees with clear guidance,

4   particularly when doing business in countries where the line between business and

5   industry is blurred (e.g., China).") (emphasis added); James R. Doty, *Toward a Reg.*

6   *FCPA: A Modest Proposal for Change in Administering the Foreign Corrupt Practices*

7   *Act*, 62 BUS. LAW. 1233, 1238-39 (2007) ("Vagueness and ambiguity are the DNA of

8   the FCPA," which "on its face is purposefully – and for companies seeking to comply,

9   often maddeningly – short on specifics."); Christopher J. Duncan, *The 1998 Foreign*

10   *Corrupt Practices Act Amendments: Moral Empiricism or Moral Imperialism?*, 1

11   Asian-Pacific L. & Pol'y J. 14 (2000) (noting that the FCPA contains "rather vague

12   standards."); David A. Gantz, *The Foreign Corrupt Practices Act: Professional and*

13   *Ethical Challenges for Lawyers*, 14 Ariz. J. Int'l & Comp. L. 97, 111-15 (1997)

14   (presenting hypothetical situations arising under the FCPA that highlight "gray areas"

15   in the statute).

16        Such criticisms have been made since at least March 1981, when the

17   "investigative arm" of Congress, the Government Accountability Office ("GAO")

18   released a report titled "Impact of Foreign Corrupt Practices Act on U.S. Business."

19   Among other things, the report noted that there was "confusion over what constitutes

20   compliance with the act's antibribery provisions," and that "corporate and

21   governmental officials have criticized the anti-bribery provisions as being ambiguous

22   about what constitutes compliance."  Hanna Decl., Exh. W at 37-38.  The ambiguities

23   included confusion or uncertainty about several issues, including the "definition of

24   'foreign official.'"  *Id.* at 38-40.  The report observed that "[t]his definition has been

25   criticized as unclear.  Lawyers we contacted questioned whether employees of public

26   corporations, such as national airlines or nationalized companies, are considered

27   foreign officials.  Similar questions have surfaced in countries – particularly

28   developing countries – where there are small and frequently closely related groups,

1   including both business and government relationships as well as families. Individuals

2   within these groups frequently move between the private and public sectors, often

3   without a clear distinction." *Id.* at 40.  *See also* Hanna Decl., Exh. X (Christopher

4   Byron, *Big Profits in Big Bribery*, TIME, Mar. 16, 1981) ("Last week's GAO study,

5   however, makes plain that the current American [FCPA] law is riddled with

6   complicating ambiguities and shortcomings."); Exh. Y (*Business:  The Trade Parade*

7   *Grows Longer*, TIME, Oct. 13, 1980) ("Last month the Carter Administration sent a

8   hefty 250-page report to Congress on the various ways the U.S. discourages exporters.

9   One example: the provisions of the 1977 Foreign Corrupt Practices Act, which have

10  never been clearly spelled out by the Justice Department.").

11        Recently, the U.S. Chamber Institute for Legal Reform, an affiliate of the U.S.

12  Chamber of Commerce, released a paper, entitled "Restoring Balance:  Proposed

13  Amendments to the Foreign Corrupt Practices Act," in which it chronicled the

14  vagueness of the term "instrumentality" as employed by the Government and declared

15  that "[t]he government's approach to what companies qualify as 'instrumentalities' of

16  foreign governments is detrimental to American business interests.  Without a clear

17  understanding of what companies are considered 'instrumentalities,' companies have

18  no way of knowing whether the FCPA applies to a particular transaction or business

19  relationship, particularly in countries like China where most if not all companies are

20  either partially or entirely owned or controlled by the state."  Hanna Decl., Exh. Z at

21  27.  "For this reason," the paper stated, "the FCPA should be modified to include a

22  clear definition of 'instrumentality.'"  *Id.*

23        Indeed, even former FCPA prosecutors have acknowledged the vagueness of the

24  FCPA's definition of "foreign official."  For example, Martin Weinstein, the lead

25  prosecutor in the 1990s Lockheed case (one of the first major corporate prosecutions

26  brought under the FCPA, which resulted in a criminal fine and civil settlement totaling

27  $24.8 million, making it the most expensive international corruption case at that time)

28  was recently asked if the FCPA was "in need of further amendment," and "[i]f so, what

46

would the 'Weinstein' amendment look like?"  Hanna Decl., ¶ AA.  Mr. Weinstein responded:

> I think the Weinstein amendment would focus on the very significant issue of who is a foreign official and what constitutes a state-controlled instrumentality. There is so little guidance in this area that an amendment to the law providing clarity to companies wishing to comply is really essential. For example, after the U.K. government takeovers of certain British banks and U.S. intervention in the auto industry, did all these private businesses become state-controlled instrumentalities rendering all their employees government officials? Companies should not have to guess who is and who is not a government official.

*Id.*

The inevitable guesswork that is required by the Government's proposed interpretation renders the statute unconstitutionally vague as applied to Defendants if adopted by this Court.  As Justice Scalia noted in his concurring opinion in *Skilling*, "[a] criminal statute must clearly define the conduct it proscribes," and a "statute that is unconstitutionally vague cannot be saved by a . . . judicial construction that writes in specific criteria that its text does not contain." *Skilling*, 130 S. Ct. at 2935 (Scalia, J., concurring in part and concurring in the judgment) (citations omitted); *cf. United States v. Goyal*, No. 08-10436, 2010 U.S. App. LEXIS 25223, at *28-*29 (Dec. 10, 2010 9th Cir.) (Kozinski, C.J., concurring) ("This is just one of a string of recent cases in which courts have found that federal prosecutors overreached by trying to stretch criminal law beyond its proper bounds. . . .  This is not the way criminal law is supposed to work.  Civil law often covers conduct that falls in a gray area of arguable legality.  But criminal law should clearly separate conduct that is criminal from conduct that is legal. . . .  When prosecutors have to stretch the law or the evidence to secure a conviction . . . it can hardly be said that [the] moral judgment [of society

47

1  regarding the defendants' behavior] is warranted. . . .  [P]erhaps . . . the government

2  will be more cautious in the future.").

3        If the Court adopts the Government's interpretation of the term

4  "instrumentality," the FCPA will be rendered void for vagueness as applied to

5  Defendants.  Simply stated, to the extent that the FCPA is construed to proscribe

6  payments made or promised to employees of state-owned companies, it is

7  constitutionally beyond salvation.

8                          **V.    CONCLUSION**

9        If the Government wants to prosecute individuals under the FCPA for allegedly

10 bribing employees of state-owned enterprises, it should lobby Congress to amend the

11 statute.  Under the *current* statute, the Government's position is without support and

12 should be rejected by the Court.  Accordingly, and for the reasons set forth above,

13 Defendants respectfully request that the Court enter an order pursuant to Fed. R. Crim.

14 P. 12(b) dismissing Counts One through Ten of the Indictment.

15 Dated:  February 21, 2011

16                                        Respectfully submitted,

17                                        GIBSON, DUNN & CRUTCHER LLP

18
                                         By:    s/Nicola T. Hanna
19                                                Nicola T. Hanna

20                                        Attorneys for Defendant STUART CARSON

21

22                                        SIDLEY AUSTIN LLP

23                                        By:    s/Kimberly A. Dunne
24                                                Kimberly A. Dunne

25                                        Attorneys for Defendant HONG CARSON

26

27                                        BIENERT, MILLER & KATZMAN, PLC

28                                        By:    s/Thomas H. Bienert, Jr.
                                                 Thomas H. Bienert, Jr.

                                        48

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Attorneys for Defendant PAUL COSGROVE

LAW OFFICES OF DAVID W. WIECHERT

By:    s/David W. Wiechert
         David W. Wiechert

Attorneys for Defendant DAVID EDMONDS

**CERTIFICATE OF SERVICE**

I hereby certify that on February 21, 2011, I electronically filed the foregoing **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS COUNTS ONE THROUGH TEN OF THE INDICTMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:

Andrew Gentin — andrew.gentin@usdoj.gov

Douglas F. McCormick — USACAC.SACriminal@usdoj.gov,
    doug.mccormick@usdoj.gov

Hank Bond Walther — hank.walther@usdoj.gov

Charles G. LaBella  —  charles.labella@usdoj.gov

Kimberly A. Dunne — kdunne@sidley.com

David W. Wiechert — dwiechert@aol.com

Thomas H. Bienert, Jr. — tbienert@ bmkattorneys.com

Kenneth M. Miller — kmiller@bmkattorneys.com

Teresa C. Alarcon — talarcon@ bmkattorneys.com

Marc S. Harris — mharris@scheperkim.com, vkirkland@scheperkim.com

Jean M. Nelson — jnelson@scheperkim.com


               /s/Nicola T. Hanna
                  Nicola T. Hanna