1  ANDRÉ BIROTTE JR.
   United States Attorney
2  DENNISE D. WILLETT
   Assistant United States Attorney
3  Chief, Santa Ana Branch Office
   DOUGLAS F. McCORMICK (180415)
4  Assistant United States Attorney
   GREGORY W. STAPLES (155505)
5  Assistant United States Attorney
          411 West Fourth Street, Suite 8000
6         Santa Ana, California 92701
          Telephone: (714) 338-3541
7         Facsimile: (714) 338-3564
          E-mail:    doug.mccormick@usdoj.gov
8
   KATHLEEN McGOVERN, Acting Chief
9  CHARLES G. LA BELLA, Deputy Chief (183448)
   ANDREW GENTIN, Trial Attorney
10 Fraud Section
   Criminal Division, U.S. Department of Justice
11        1400 New York Avenue, N.W.
          Washington, DC 20005
12        Telephone: (202) 353-3551
          Facsimile: (202) 514-0152
13        E-mail:    charles.labella@usdoj.gov
                     andrew.gentin@usdoj.gov
14
   Attorneys for Plaintiff
15 United States of America

16                 UNITED STATES DISTRICT COURT

17            FOR THE CENTRAL DISTRICT OF CALIFORNIA

18                      SOUTHERN DIVISION

19 UNITED STATES OF AMERICA,    ) NO. SA CR 09-00077-JVS
                                )
20          Plaintiff,          ) GOVERNMENT'S OPPOSITION TO
                                ) DEFENDANTS' MOTION TO SUPPRESS
21          v.                  ) DEFENDANTS' STATEMENTS; MEMORANDUM
                                ) OF POINTS AND AUTHORITIES;
22 STUART CARSON et al.,        ) DECLARATION OF SPECIAL AGENT BRIAN
                                ) J. SMITH AND ASSISTANT UNITED
23          Defendants.         ) STATES ATTORNEY DOUGLAS F.
                                ) McCORMICK
24 _____       )
                                  Hearing Date & Time:
25                                   May 14, 2012
                                     9:00 a.m.
26

27      Plaintiff United States of America, by and through its

28 attorneys of record, the United States Department of Justice,

1  Criminal Division, Fraud Section, and the United States Attorney

2  for the Central District of California (collectively, "the

3  government"), hereby files its Opposition to Defendants' Motion

4  to Suppress Statements.  This Opposition is based upon the

5  attached memorandum of points and authorities, the Declarations

6  of FBI Special Agent Brian J. Smith and Assistant United States

7  Attorney Douglas F. McCormick attached hereto, the files and

8  records in this matter, as well as any evidence or argument

9  presented at any hearing on this matter.

10  DATED: April 2, 2012          Respectfully submitted,

11                                ANDRE BIROTTE JR.
                                  United States Attorney
12
                                  DENNISE D. WILLETT
13                                Assistant United States Attorney
                                  Chief, Santa Ana Branch Office
14
                                  DOUGLAS F. McCORMICK
15                                Assistant United States Attorney
                                  Deputy Chief, Santa Ana Branch Office
16
                                  GREGORY W. STAPLES
17                                Assistant United States Attorney

18                                KATHLEEN McGOVERN, Acting Chief
                                  CHARLES G. LA BELLA, Deputy Chief
19                                ANDREW GENTIN, Trial Attorney
                                  Fraud Section, Criminal Division
20                                United States Department of Justice

21                                /s/
                                  _____
22                                DOUGLAS F. McCORMICK
                                  Assistant United States Attorney
23
                                  Attorneys for Plaintiff
24                                United States of America

25

26

27

28

**TABLE OF CONTENTS**

DESCRIPTION                                                           PAGE

**TABLE OF AUTHORITIES** . . . . . . . . . . . . . . . . . . . . .  ii

**MEMORANDUM OF POINTS AND AUTHORITIES** . . . . . . . . . . . . . 1

**I.    INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . 1

**II.   BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    The Government's Principles of
        Corporate Prosecution . . . . . . . . . . . . . . . . . 2

    B.    The Company's Voluntary Disclosure  . . . . . . . . . 4

    C.    August 15-17, 2007:  E-mails Between the
        Company and the Government  . . . . . . . . . . . . . 4

    D.    The Company's Interviews  . . . . . . . . . . . . . . 6

**III. ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . 10

    A.    Neither the Company Nor Its Lawyers Were
        State Actors at the Time of Defendants'
        Interviews . . . . . . . . . . . . . . . . . . . . . 11

    B.    Defendants' Statements Were Not Involuntary . . . . 19

**IV. CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . 25

i

**TABLE OF AUTHORITIES**

DESCRIPTION                                                        PAGE

UNITED STATES CONSTITUTION:

U.S. Const. amend V  . . . . . . . . . . . . . . . . . . . .  10

CASES:

Aquilera v. Baca,
      510 F.3d 1161 (9th Cir. 2007) . . . . . . . . . . . . .  23

Blum v. Yaretsky,
      457 U.S. 991 (1982) . . . . . . . . . . . . . . . . . .  13

Carlin Communications, Inc. v. Mountain States
Telegraph & Telegraph Co.,
      827 F.2d 1291 (9th Cir. 1987) . . . . . . . . . . . . .  14

D.L. Cromwell Investments, Inc. v. NASD Regulation, Inc.,
      279 F.3d 155 (2d Cir. 2002) . . . . . . . . . . . . . .  11

Fisher v. United States,
      425 U.S. 391 (1976) . . . . . . . . . . . . . . . . . .  11

Flagg v. Yonkers Sav. & Loan Association,
      396 F.3d 178 (2d Cir. 2005) . . . . . . . . . . . . . .  13

Garrity v. New Jersey,
      385 U.S. 493 (1967) . . . . . . . . . . . . . .  19, 20, 24

Jackson v. Metropolitan Edison Co.,
      419 U.S. 345 (1974) . . . . . . . . . . . . . . . . . .  12

Lugar v. Edmondson Oil Co.,
      457 U.S. 922 (1982) . . . . . . . . . . . . . . . . . .  11

San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.,
      483 U.S. 522 (1987) . . . . . . . . . . . . . . . . . .  13

Sutton v. Providence St. Joseph Medical Ctr.,
      192 F.3d 826 (9th Cir. 1999) . . . . . . . . . . . . .  14

United States v. Bowers,
      739 F.2d 1050 (6th Cir. 1984) . . . . . . . . . . . . .  24

United States v. Day,
      591 F.3d 679 (4th Cir. 2010) . . . . . . . . . . . . .  12

United States v. Ferguson,
      2007 WL 4240782 (D. Conn. Nov. 30, 2007) . . . . . .  passim

ii

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                        PAGE

CASES (cont'd.):

United States v. Miller,
        688 F.2d  652 (9th Cir. 1982) . . . . . . . . . . . . .   11

United States v. Moyer,
        --- F.3d ---, 2012 WL 639277 (3rd Cir. Feb. 29, 2011) .   19

United States v. Reed,
        15 F.3d 928 (9th Cir. 1994) . . . . . . . . . . . . . .   11

United States v. Saechao,
        418 F.3d 1073 (9th Cir. 2005) . . . . . . . . . . . . .   23

United States v. Solomon,
        509 F.2d 863 (2d Cir. 1975) . . . . . . . . . . . . . .   23

United States v. Stein,
        233 F.3d 6 (1st Cir. 2000) . . . . . . . . . . . . . .   24

United States v. Stein,
        541 F.3d 130 (2d Cir. 2008) . . . . . . . . . . . . . .   12

United States v. Stein,
        435 F. Supp. 2d 330 (S.D.N.Y. 2006) . . . . . . . .  passim

United States v. Stein,
        440 F. Supp. 2d 315 (S.D.N.Y. 2006) . . . . . . . .  passim

United States v. Vangates,
        287 F.3d 1315 (11th Cir. 2002) . . . . . . . . . . . .   21

United States v. Waldon,
        363 F.3d 1103 (11th Cir. 2004) . . . . . . . . . . . .   22

United States v. Walther,
        652 F.2d 788 (9th Cir. 1981) . . . . . . . . . . . 11, 12

United States v.  Yielding,
        657 F.3d 688 (8th Cir. 2011) . . . . . . . . . . . . .   18

Upjohn Co. v. United States,
        449 U.S. 383 (1981) . . . . . . . . . . . . . . . 7, 9, 10

STATUTES:

18 U.S.C. § 1519 . . . . . . . . . . . . . . . . . . . . . .   18

iii

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**INTRODUCTION**

On August 16 and 17, 2007, outside counsel for Control Components, Inc. ("CCI," or "the Company") interviewed several of the Company's senior executives, including defendants Hong "Rose" Carson, Paul Cosgrove, and David Edmonds ("defendants"), as part of the Company's internal investigation into whether corrupt payments had been made by the Company and its employees to secure or retain business.  One day earlier, CCI had, through counsel, voluntarily disclosed its internal investigation and the underlying concerns to the United States Department of Justice ("the government").  Defendants now ask this Court to suppress statements they made during the interviews, arguing that their participation in the interviews was coerced in violation of their Fifth Amendment rights against self-incrimination.  Defendants' Notice of Motion and Motion to Suppress Defendants' Statements (Dkt. #573) ("Defts' Suppression Motion").  Defendants contend that the Company was a state actor at the time of the interviews by virtue of its voluntary disclosure and contemplated cooperation with the government and that their statements were improperly coerced by threats of termination.

Defendants' motion to suppress should be denied.  Only state actors can violate a defendant's Fifth Amendment rights, and the evidence shows that the Company's actions were not the result of any pressure or influence from the government sufficient to convert the Company's lawyers to state actors.  Nor can defendants show that their statements were involuntary, as the

1

evidence does not show that defendants were threatened with termination.

## II.

### BACKGROUND

A.   The Government's Principles of Corporate Prosecution

The Justice Department has long had a written policy governing its treatment of corporate wrongdoing.  Since the late 1990s, that policy has been memorialized in a series of memoranda written by the Deputy Attorney General, one of the highest-ranking officials in the Department.  In 2006, then-Deputy Attorney General Paul J. McNulty wrote a memorandum ("the McNulty Memorandum") to all federal prosecutors in which he updated the government's "Principles of Federal Prosecution of Business Organizations."  Declaration of Douglas F. McCormick attached hereto ("McCormick Decl."), Exh. A.[1]  Under the McNulty Memorandum, federal prosecutors were instructed that they must consider "the corporation's timely and voluntary disclosure of wrongdoing and its willingness to cooperate in the investigation of its agents."  Id. at 4.  The memorandum elaborates as follows:

> In determining whether to charge a corporation, that corporation's timely and voluntary disclosure of wrongdoing and its cooperation with the government's investigation may be relevant factors.  In gauging the extent of the corporation's cooperation, the prosecutor may consider, among other things, whether the corporation made a voluntary and timely disclosure, and the corporation's willingness to provide relevant evidence and to identify the culprits within the corporation, including

---

[1] Earlier versions of the McNulty Memorandum are sometimes called the "Holder Memorandum" or the "Thompson Memorandum," after the Deputy Attorneys General who authored them.

2

1    senior executives.

2    Id. at 7.

3        The McNulty Memorandum departed from earlier versions in its

4    discussion of how the government should consider a corporation's

5    advancement of attorney's fees:

6            Another factor to be weighed by the
             prosecutor is whether the corporation appears
7            to be protecting its culpable employees and
             agents.  Thus, while cases will differ
8            depending on the circumstances, a
             corporation's promise of support to culpable
9            employees and agents, e.g., through retaining
             the employees without sanction for their
10           misconduct or through providing information
             to the employees about the government's
11           investigation pursuant to a joint defense
             agreement, may be considered by the
12           prosecutor in weighing the extent and value
             of a corporation's cooperation.

13
             Prosecutors generally should not take into
14           account whether a corporation is advancing
             attorneys' fees to employees or agents under
15           investigation and indictment.  Many state
             indemnification statutes grant corporations
16           the power to advance the legal fees of
             officers under investigation prior to a
17           formal determination of guilt.  As a
             consequence, many corporations enter into
18           contractual obligations to advance attorneys'
             fees through provisions contained in their
19           corporate charters, bylaws or employment
             agreements.  Therefore, a corporation's
20           compliance with governing state law and its
             contractual obligations cannot be considered
21           a failure to cooperate.  This prohibition is
             not meant to prevent a prosecutor from asking
22           questions about an attorney's representation
             of a corporation or its employees.

23

24   Id. at 11-12 (emphasis added).  The change reflected the

25   Department's response to judicial criticism of the Department's

26   earlier position that potentially penalized corporations that

27   elected to pay the attorney's fees of employees under

28   investigation.   See, e.g., United States v. Stein, 435 F. Supp.

                                    3

1  2d 330, 362-65 (S.D.N.Y. 2006) ("Stein I").

2  B.   The Company's Voluntary Disclosure

3       CCI is a wholly-owned subsidiary of IMI plc, an English

4  company publicly traded on the London Stock Exchange.  On August

5  15, 2007, IMI's management informed its Board of Directors of

6  possible improper payments made by CCI.  See United States v.

7  Control Components, Inc., Case No. SA CR 09-00162-JVS, Dkt. #11

8  at 5.[2]  IMI's Board of Directors directed a voluntary disclosure

9  of the investigation to the United States Department of Justice

10 as well as authorities in the United Kingdom.  Id.  That same

11 date, IMI made a voluntary disclosure in which it advised the

12 government of possible FCPA violations by CCI and its employees.

13 See Declaration of Brian M. Heberlig in Support of Motion to

14 Intervene by IMI plc and Control Components, Inc. (Dkt. #104) at

15 2.  (The government has submitted in camera the notes of Mark F.

16 Mendelsohn, then-Deputy Chief of the Department of Justice's

17 Fraud Section, reflecting his summary of IMI's voluntary

18 disclosure.)

19 C.   August 15-17, 2007:  E-mails Between the Company and the
        Government

20

21      Shortly after the Company made its voluntary disclosure, one

22 of its lawyers, Steptoe & Johnson LLP ("Steptoe") partner Patrick

23 M. Norton ("Mr. Norton"), wrote the following e-mail to the

24 aforementioned Mr. Mendelsohn:[3]

25  ───────────────

26      [2] All page references to docketed filings are to the ECF
27 page number at the top of the page, i.e. "Page __ of __."

28      [3] At the time Mr. Mendelsohn oversaw all of the government's
   FCPA cases; he left the government in 2010.

                                 4

1

Mark,

2

I've been discussing with IMI's general
counsel the feasibility of holding off on
their announcement to the London Exchange. He
doesn't think it's doable.  The Company's
Board of Directors, on advice from UK
counsel, decided at about 6 PM UK time to
issue the release at 7:30 AM in London
tomorrow. It's already 9:30 PM in the UK
(about 8:30 - 9 when we spoke), and the
wheels are in motion.  It's simply not
feasible to get UK counsel to opine on this
and contact all the Board members in time to
derail the announcement.  There would also be
a significant risk of a leak if they tried to
do this at the last moment, and that would
create other problems.

We fully recognize your and our interest in
getting access to senior management who may
have been involved in the payments in
questions while may still be willing to
cooperate.  To that end, I am now planning to
fly to LA this evening or first thing in the
morning and to be present when the
individuals are informed that they are being
suspended pending the investigation.  We
intend to inform them that the suspension is
temporary and we are not prejudging the
outcome, but that the company expects them to
cooperate with the investigation.  Then I
proceed to interview them.

This will give our associate in LA time to
assemble many, if not all, of the relevant
documents.

I would hope to be able to advise you by the
end of the day tomorrow (probably COB PDT)
whether the individuals are cooperating or
not.  If they are, you can then decide
whether  you wish to send someone from the
DOJ or FBI to speak to them.  I will also be
on-site to help coordinate with the company.
If they refuse to cooperate with us, they
will presumably refuse to cooperate with you
too. In either case, you should have a better
idea of what course you wish to take.

If you want to discuss, I expect to be in the
office until about 6:15. . . .

Regards,
Pat

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

5

1  McCormick Decl., Exh. B at 2.[4]

2       Mr. Norton sent Mr. Mendelsohn a second e-mail at 1:22 a.m.

3  on Friday, August 17, 2007, in which he updated Mr. Mendelsohn on

4  the first day of interviews:

5             Mark,

6             We interviewed five of the senior management
              at CCI today in very general terms.  So far
7             they are being cooperative.  We intend to ask
              more difficult questions tomorrow based on
8             specific documents.

9             If you would like to discuss this, please
              suggest a time by email, and I['ll try to
10            break away.

11            Best regards,
              Pat
12

13 Id. at 2-3.  Mr. Mendelsohn responded several hours later:

14            Thanks, Pat. I will be out of the office on
              Friday [August 17, 2007]. I suggest we speak
15            early next week, after you have gotten into
              specifics.
16

17 Id. at 3.

18 D.   The Company's Interviews

19      As reflected in the e-mails between Mr. Norton and Mr.

20 Mendelsohn, Mr. Norton and other Steptoe attorneys conducted

21 interviews of company employees at CCI's corporate headquarters

22 in Rancho Santa Margarita, California, on August 16 and 17, 2007.

23 No FBI agents were present.  Declaration of Special Agent Brian

24 J. Smith attached hereto ("Smith Decl."), ¶¶ 2-4.  Steptoe

25 attorneys instructed the witnesses that the interviews were

26

27      [4] This e-mail is time-stamped at 4:49 p.m. Eastern Time.  It
   reflects that Messrs. Mendelsohn and Norton had a conversation
28 about one hour earlier, at approximately 3:30 or 4:00 p.m.

confidential and protected by the attorney-client privilege.
Declaration of Brian Heberlig (Dkt. #121-2) at 4.   Steptoe
attorneys also gave so-called Upjohn warnings[5] to each witness
indicating that the contents of the interview were privileged,
but that the privilege and the decision whether to waive it
belonged to IMI, not the employee.   Id.   Steptoe attorneys also
told the witnesses that they represented IMI, not the witness
personally.   Id.

On August 16, 2007, CCI's then-President, Ian Whiting, held
an all-personnel meeting at which he informed personnel of the
investigation and the interviews.   Both Mr. Edmonds and Mrs.
Carson describe being present at this meeting.   Mr. Edmonds says
that "Whiting announced that IMI had launched an investigation
into possible irregular payments and he ordered that every
employee must fully cooperate with the investigation and meet as
required with investigators."   Declaration of David Edmonds in
Support of Defendants' Motion to Suppress Defendants' Statements
(Dkt. #573-3) ("Edmonds Decl."), ¶ 2.[6]

Whiting subsequently met with Mr. Edmonds, Mr. Cosgrove, and
Mrs. Carson individually.   Mr. Edmonds's declaration states that
Mr. Whiting told Mr. Edmonds that "he [Whiting] expected my full
cooperation with the investigation."   Edmonds Decl., ¶ 3.   Mr.
Cosgrove states that Mr. Whiting "directed me to cooperate in

---

[5] Upjohn Co. v. United States, 449 U.S. 383 (1981).

[6] Mrs. Carson claims that because of Mr. Whiting's British
accent and the vocabulary he used, she did not understand "the
specifics of the scope of the investigation."   Declaration of
Hong Jiang Carson ("Carson Decl."), ¶ 2.

1  CCI's internal investigation and submit to an interview with

2  Steptoe."   Declaration of Paul Cosgrove (Dkt. #573-4) ("Cosgrove

3  Decl."), ¶ 2.

4      At no time did Mr. Whiting or anyone else at IMI or CCI

5  threaten to fire Mr. Edmonds, Mr. Cosgrove, or Mrs. Carson if

6  they did not cooperate with the investigation.   Mr. Edmonds's own

7  declaration makes this clear: "Because I was ordered by the

8  President of CCI [Whiting] to cooperate with the investigation

9  and meet as required with investigators, _I believed_ that if I did

10 not do what I was told and cooperate and meet with investigators,

11 I would be fired."   Edmonds Decl., ¶ 4 (emphasis added).

12 Likewise, Mr. Cosgrove states that "_I believed_ that if I did not

13 agree to submit to an interview, _I could_ lose my job for

14 disobeying an order from CCI's President."   Cosgrove Decl., ¶ 2

15 (emphasis added).

16     Mr. Cosgrove states that there were "two gentlemen" he did

17 not recognize at CCI on August 17, 2007, and that he was "later

18 told" that they "were in fact FBI agents."   Cosgrove Decl., ¶ 4.

19 Mr. Cosgrove's information is incorrect; no FBI agents were at

20 CCI on August 17, 2007, and, in fact, the FBI's investigation of

21 CCI's activities was not even opened until two months later.   See

22 Smith Decl., ¶¶ 2-4.

23     After describing Mr. Whiting's initial announcement, Mrs.

24 Carson says she was asked to come out of the restroom on the

25 morning of August 17, 2007.   Carson Decl., ¶ 2.[7]   Mrs. Carson

26

27     [7] The indictment alleges that Mrs. Carson was destroying
   documents related to the internal investigation "by, among other
28 things, taking such documents to the CCI ladies' room, tearing up

                                    8

describes being asked to go to a conference room where she was
subsequently asked to remain.  Mrs. Carson says she "felt there
would be serious repercussions to [her] employment, including the
possibility of immediate termination, if I did not comply with
her instructions to stay in the conference room."  Carson Decl.,
¶ 3.  Mrs. Carson then describes being escorted to a second
conference room, where she was interviewed by Steptoe lawyers.
Id., ¶¶ 4-5.  Mrs. Carson says she "do[es] not remember being
told that I was going to be meeting with lawyers for the company
before being taken to this conference room."  Id., ¶ 4.  Mrs.
Carson states that "at all times during the events described
above, including meeting with the lawyers, I felt that I could
not leave the company and that if I did not comply with the
various requests, I would be fired or suffer negative
consequences regarding my CCI [sic]."  Id., ¶ 7.

Mr. Whiting's statements to defendants were documented in an
identical memorandum he wrote to each of them on August 17, 2007.
McCormick Decl., Exhs. C1-C3 ("Whiting Memorandum").  The Whiting
Memorandum stated, in pertinent part:

> I write to confirm the conversation we had
> today.  As you and I discussed, IMI has
> launched an investigation into possible
> irregular payments associated with certain
> trading contracts entered into by its Severe
> Service business.  The Company is committed
> to the highest ethical standards and takes
> these matters very seriously.  We have
> retained external counsel and other
> consultants to conduct a thorough,
> independent investigation.
>
> As someone involved in the Severe Service

---

the documents, and flushing them down a toilet."  Trial
Indictment at 27.

business, <u>the Company expects you to
cooperate fully in this process</u>.
Arrangements have been made for you to meet
with the investigators.  When you do so,
<u>please answer all their questions and furnish
all information they request</u>.  Should the
investigators contact you later for further
discussions or additional information, please
comply promptly.  We remind you that you must
keep all your discussions with the
investigators in the strictest confidence.
You should disclose them to no one, inside or
outside the Company, without advance
permission from Ian Whiting.

This also confirms that you are being
suspended, with pay, during the investigation
process.  Again, <u>we emphasize that this is
not a termination of your employment</u>.  Nor is
it a determination that you have made
irregular payments or otherwise behaved
unethically.  Should there be indications of
misconduct, you will be afforded an
opportunity to give your side of the story
during this phase of the investigation.  You
will be asked to report back to work once a
determination is made that you have not
engaged in misconduct.  In the event you are
found to have engaged in misconduct, you will
be subject to disciplinary action, up to and
including termination of employment.

<u>Id.</u> (emphases added).  The government is aware of no evidence

that suggests that defendants have claimed, at least prior to

this motion to suppress, that the Whiting Memoranda's description

of Mr. Whiting's interactions with defendants is inaccurate.

**III.**

**ARGUMENT**

The Fifth Amendment provides that "[n]o person . . . shall

be compelled in any criminal case to be a witness against

himself."  U.S. Const. amend V.  For Fifth Amendment protections

to apply in the context of a corporate internal investigation,

two elements must be satisfied:

First, only "state actors" can violate a defendant's Fifth

10

Amendment rights; the Fifth Amendment restricts only governmental conduct, and will constrain a private entity only insofar as its actions are found to be "fairly attributable" to the government. See Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982); D.L. Cromwell Investments, Inc. v. NASD Regulation, Inc., 279 F.3d 155, 161 (2d Cir. 2002).

Second, the statements taken must be compelled. See Fisher v. United States, 425 U.S. 391, 399 (1976) ("[T]he Court has never on any ground . . . applied the Fifth Amendment to prevent the otherwise proper acquisition or use of evidence which . . . did not involve compelled testimonial self-incrimination of some sort.") (emphasis added); see also id. at 408 ("[T]he Fifth Amendment does not independently proscribe the compelled production of every sort of incriminating evidence but applies only when the accused is compelled to make a Testimonial Communication that is incriminating.").

A.   Neither the Company Nor Its Lawyers Were State Actors at the Time of Defendants' Interviews

Defendants cite two different lines of cases for determining that CCI and Steptoe were state actors when they conducted interviews of defendants as part of their internal investigation. Deft's Suppression Motion at 17-18, 20-21. As part of the first, defendants cite Ninth Circuit cases -- e.g., United States v. Reed, 15 F.3d 928 (9th Cir. 1994), United States v. Miller, 688 F.2d 652 (9th Cir. 1982), and United States v. Walther, 652 F.2d 788 (9th Cir. 1981) -- involving the application of Fourth Amendment principles to private party searches. Defts' Suppression Motion at 17-18. Those cases stand for the

11

proposition that "the government cannot knowingly acquiesce in
and encourage directly or indirectly a private citizen to engage
in activity which it is prohibited from pursuing where that
citizen has no motivation other than the expectation of reward
for his or her efforts."  <u>Walther</u>, 652 F.2d at 793.

While defendants correctly cite <u>United States v. Day</u>, 591
F.3d 679, 683 (4th Cir. 2010), for the proposition that
"regardless of whether the Fourth or Fifth Amendment is at issue,
we apply the same test to determine whether a private individual
acted as a Government agent," Deft's Suppression Motion at 17 n.
6, the cases analyzing whether a private entity's conduct should
be considered "state action" for purposes of the Fifth Amendment
have engaged in a different analysis.  <u>See</u>, <u>e.g.</u>, <u>United States</u>
<u>v. Stein</u>, 541 F.3d 130, 146-47 (2d Cir. 2008); <u>United States v.</u>
<u>Ferguson</u>, 2007 WL 4240782 (D. Conn. Nov. 30, 2007).  Those cases
have looked to whether the government has become so pervasively
entangled in private activity that purportedly private conduct
should be attributed to the state or the government has
encouraged or facilitated the challenged activity.

Under this line of cases, actions of a private entity are
attributable to the State if "there is a sufficiently close nexus
between the State and the challenged action of the . . . entity
so that the action of the latter may be fairly treated as that of
the State itself."  <u>Jackson v. Metropolitan Edison Co.</u>, 419 U.S.
345, 351 (1974); <u>accord</u> Defts' Suppression Motion at 20 (noting
that this line of cases is a "second distinct doctrinal basis"
for finding state action).  This close nexus requirement is not
satisfied by evidence that the government merely approves of or

12

acquiesces in the initiatives of the private entity.  <u>San</u>
<u>Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.</u>, 483 U.S.
522, 547 (1987).  "The purpose of the [close-nexus requirement]
is to assure that constitutional standards are invoked only when
it can be said that the State is responsible for the specific
conduct of which the plaintiff complains."  <u>Blum v. Yaretsky</u>, 457
U.S. 991, 1004 (1982).  Such responsibility is normally found
when the State "has exercised coercive power or has provided such
significant encouragement, either overt or covert, that the
choice must in law be deemed to be that of the State."  <u>Id.</u>  "A
nexus of state action exists between a private entity and the
state when the state exercises coercive power, is entwined in the
management or control of the private actor, or provides the
private actor with <u>significant encouragement</u>, either overt or
covert, or when the private actor operates as a <u>willful</u>
<u>participant in joint activity </u>with the State or its agents, is
controlled by an agency of the State, has been delegated a public
function by the state, or is <u>entwined with governmental</u>
<u>policies</u>."  <u>Flagg v. Yonkers Sav. & Loan Ass'n</u>, 396 F.3d 178, 187
(2d Cir. 2005) (emphases added and internal quotation marks
omitted).  Furthermore, "the transformation of a private entity
into a state actor 'requires a nexus between the state and the
<u>specific</u> conduct of which plaintiff complains.'"  <u>Ferguson</u>, 2007
WL 4240782, at *6 (emphasis in original) (citations omitted)
(cooperating company was not a state actor where, unlike <u>Stein</u>
<u>II</u>, there were no meetings between prosecutors and the company to
determine how best to pressure employees into cooperation and no
government-approved threats that hinged the payment of legal fees

1    on cooperation with the government).

2         While the Ninth Circuit has not addressed what test should

3    be applied when determining whether a private entity is a state

4    actor for Fifth Amendment purposes, it has adopted a nexus

5    analysis in other, non-Fourth Amendment contexts.  When it

6    affirmed a district court's dismissal of a Religious Freedom

7    Restoration Act ("RFRA") claim, the Ninth Circuit held that

8    plaintiff failed to satisfy the "state action" requirement of the

9    RFRA because governmental compulsion in the form of a generally

10   applicable law, without more, could not transform every private

11   entity that followed the law into a state actor.  Sutton v.

12   Providence St. Joseph Med. Ctr., 192 F.3d 826, 841 (9th Cir.

13   1999).  Rather, the Court held, the plaintiff must establish some

14   other nexus sufficient to make it fair to attribute liability to

15   the private entity.  Id.; see also Carlin Communications, Inc. v.

16   Mountain States Tel. & Tel. Co., 827 F.2d 1291, 1295 (9th Cir.

17   1987) (holding that private telephone company was state actor

18   when it terminated services of another company at direction of

19   county attorney because county attorney threatened to bring

20   charges if it refused).

21        Defendants rely heavily on the district court's conclusion

22   in United States v. Stein, 440 F. Supp. 2d 315 (S.D.N.Y. 2006)

23   ("Stein II"), that the government's conduct coerced defendants

24   into making statements they otherwise would not have made.  See

25   Deft's Suppression Motion at 24 ("Just as in Stein II, there was

26   a clear and close nexus between DOJ and the coercion of

27   Defendants, making CCI and Steptoe state actors.").  But Stein II

28   is readily distinguishable.

                              14

1    Stein II's suppression of defendants' statements followed

2    its decision in Stein I, where it found that the government

3    violated the Sixth Amendment rights of KPMG's employees by

4    pressuring KPMP not to pay employees' legal fees in the context

5    of the government's criminal investigation.  435 F. Supp. 2d at

6    367-69.  In Stein I, the district court found that various

7    statements made and actions taken by the government, coupled with

8    the treatment of attorney's fees in the Thompson Memorandum,

9    effectively coerced KPMG to abandon its longstanding practice of

10   indemnifying employees through the advancement of legal defense

11   costs.  Id. at 365.[8]

12       When considering whether to suppress defendants' statements,

13   Stein II relied explicitly on the its earlier factual findings:

14   "Here, the government quite deliberately precipitated KPMG's use

15   of economic threats to coerce the proffer statements in

16   question."  440 F. Supp. 2d at 334.  Stein II's analysis cited

17   not only the Thompson Memorandum but also the government's

18   threats to consider KPMG's failure to cut off attorney's fees for

19   uncooperative employees as well as the government's practice of

20   reporting uncooperative employees to KPMG "in circumstances in

21   which there was no conceivable reason for doing so except to

22   facilitate the firing threats that ensued."  Id. at 335.

23       It is clear from the district court's opinion that the

24   court's holding relied on much more than just the Thompson

25

26       [8] KPMG's willingness to cooperate manifested itself in other
     ways, too.  For instance, its outside counsel told the government
27   it would recommend to employees law firms who understood that
     cooperation was the best way to proceed, 435 F. Supp. 2d at 345
28   n.54, a fact the district court called "quite disturbing."

                                15

Memorandum:

> The Moving Defendants . . . point to the
> Thompson Memorandum, which quite specifically
> tells a company under investigation, as was
> KPMG, that a failure to ensure that its
> employees tell prosecutors what they know may
> contribute to a decision to indict, and, in
> this case, likely destroy the company.  <u>And</u>
> <u>they point also</u> to the USAO's close
> involvement in KPMG's decision making process
> by, among other things, pointedly reminding
> KPMG that it would consider the Thompson
> Memorandum in deciding whether to indict,
> saying that payment of employee legal fees
> would be viewed "under a microscope," and
> reporting to KPMG the identities of employees
> who refused to make statements in
> circumstances in which the USAO knew full
> well that KPMG would pressure them to talk to
> prosecutors. . . .
>
> . . . This Court finds that the government,
> both through the Thompson Memorandum <u>and the</u>
> <u>actions of the USAO</u>, quite deliberately
> coerced, and in any case significantly
> encouraged, KPMG to pressure its employees to
> surrender their Fifth Amendment rights.

<u>Id.</u> at 336-37 (emphasis added).

The first critical distinction between <u>Stein II</u> and these circumstances is straightforward.  In <u>Stein II</u>, the statements in question were made <u>to the government directly</u>, which made it far easier for the district court in <u>Stein II</u> to conclude there was state action.  Here, by comparison, the government was not present when the interviews were conducted, and defendants must persuade the Court that the Company's lawyers were state actors.

But more essentially, there is no evidence here that anyone from the government "deliberately coerced" or "significantly encouraged" anything with respect to the Company's own internal investigation and its interviews of its own employees.  The e-mails between Mr. Norton and Mr. Mendelsohn do not demonstrate

16

either a close nexus between Steptoe/CCI and the government or
the kind of governmental coercion or encouragement present in
Stein II.  This conclusion is underscored in the Whiting
Memorandum.  To be sure, the Whiting Memorandum confirms that IMI
has launched an investigation because "[t]he Company is committed
to the highest ethical standards" and IMI takes the matter
seriously.  McCormick Decl., Exh. C1 at 1.  The e-mails confirm
that Steptoe/CCI was conducting the investigation and interviews
for its own purposes.

Shortly after making the voluntary disclosure, Mr. Norton's
first e-mail informs the government that (1) IMI was going ahead
with a planned press release despite apparent government concerns
about its timing; (2) the company would be temporarily suspending
certain employees and then interviewing them, without any
direction or input from the government over which employees would
be interviewed or the appropriateness of the actions; and (3) the
company would inform the government the following day whether the
suspended employees were cooperating so that "you should have a
better idea of what course you wish to take."  McCormick Decl.,
Exh. B at 2.  The text of the e-mail itself does not suggest a
close nexus.  Mr. Norton uses the pronoun "our" to describe CCI's
actions and "your" to describe the government's.  See id.

Mr. Norton then informed the government the following night
that he had interviewed five of the senior managers and that
Steptoe intended to ask more difficult questions of the employees
the following day based on specific documents.  Id.  Rather than
asking the government for approval to conduct the interviews or
asking for specific questions or areas of inquiry, Mr. Norton

17

1    simply indicated that he would be available if the government

2    wanted to discuss the matter further.  Id. at 3.  Mr. Mendelsohn

3    responded the following morning that he would be out of the

4    office on Friday and suggested they speak early next week, after

5    Steptoe had gotten into specifics.  Id.

6         These e-mails show no nexus between the Company and the

7    government.  Instead, they show a company in cooperative mode

8    informing the government of what is transpiring in its internal

9    investigation.  See, e.g., Ferguson, 2007 WL 4240782, at *5

10   (company's efforts to cooperate with the government do not

11   transform company into an arm of the state).  At no time did the

12   government direct the actions of Steptoe/CCI.  The government did

13   not instruct the company who to interview or what questions to

14   ask.  In fact, the government provided no direction or

15   instruction as to the conduct of the interviews.  See, e.g., id.

16   at *6 (cooperating company was not a state actor in absence of

17   "coercive" actions taken by government).

18        Defendants contend (Defts' Suppression Motion at 19) that it

19   is inconsistent for the government to contend that Steptoe/CCI

20   were not state actors at the time of their interviews, because

21   the government once charged Mrs. Carson with a violation of 18

22   U.S.C. § 1519 for conduct (the toilet-flushing incident) that

23   occurred within the same time frame.  But § 1519 does not require

24   the existence of a pending investigation, see United States v.

25   Yielding, 657 F.3d 688, 711 (8th Cir. 2011) ("The statue . . .

26   does not allow a defendant to escape liability for shredding

27   documents with intent to obstruct a foreseeable investigation . .

28   . just because the investigation has not yet commenced."), and

18

numerous cases have concluded that there is no "nexus"
requirement that the obstructive conduct be tied to a pending or
imminent proceeding or matter, <u>see</u> <u>United States v. Moyer</u>, ---
F.3d ---, 2012 WL 639277, at *11 (3rd Cir. Feb. 29, 2011).  Thus,
the now-dismissed count, which alleged that Mrs. Carson's
obstructive conduct occurred "in . . . contemplation of" a
federal investigation, does not somehow turn Steptoe/CCI into
state actors.

       Without the type of coercive conduct present in <u>Stein II</u>,
defendants are left with only the Company's voluntary disclosure
coupled with the McNulty Memorandum's guidance to federal
prosecutors to consider a corporation's cooperative efforts.
Finding "state action" on these facts alone would be
unprecedented and unwarranted, the effect of which would be to
turn the cooperating company into a government agent in every
case.  There is no precedent for such an outcome.

B.    <u>Defendants' Statements Were Not Involuntary</u>

       Nor is there any merit to defendants' claim that their
statements were coerced.  Even by their own version of events,
defendants cannot demonstrate that their statements were
compelled and were thus involuntary.  Defendants' motion to
suppress should fail for this separate, independent reason.

       Defendants' compulsion argument relies principally on
<u>Garrity v. New Jersey</u>, 385 U.S. 493 (1967), and its progeny.  In
<u>Garrity</u>, the New Jersey Attorney General questioned several
police officers during an investigation of alleged fixing of
traffic tickets.  <u>Id.</u> at 494.  Before being questioned, each
officer was warned that he could invoke his Fifth Amendment

privilege against self-incrimination and refuse to answer, but
that if he did so, he could be fired pursuant to a state statute
that required complete candor of its officers.  Id.  Prosecutors
subsequently used the officers' responses to prosecute them for
conspiracy to obstruct the administration of traffic laws.  Id.
The officers appealed their convictions on the ground that their
statements had been coerced.  Id. at 495.  The Supreme Court held
that the test for coercion was "whether the accused was deprived
of his free choice to admit, to deny, or to refuse to answer."
Id. at 496 (internal quotations marks and citations omitted).
The Court analogized the loss of a government job to forfeiture
of property protected by the Fourteenth Amendment, and held that
the threat of losing one's livelihood could prevent a person from
making a free and rational choice to invoke the constitutional
right against self-incrimination.  Id. at 497 (being faced with
the "option to lose their means of livelihood or to pay the
penalty of self-incrimination . . . is 'likely to exert such
pressure upon an individual as to disable him from making a free
and rational choice.'") (citation omitted).

It is clear, however, that to constitute compulsion,
defendants must demonstrate that they faced a "clear-cut" choice
between asserting their right against self-incrimination or
suffering economic hardship.  See United States v. Ferguson, 2007
WL 4240782, at *7 (D. Conn.) (finding defendant's statement was
not involuntary where letter from defendant's employer "did not
contain overt threats to cooperate at the risk of serious
personal consequences; rather, the letter only informed him that
(1) [the employer] would consider disciplining employees who

1    failed to cooperate, and (2) [the employer] would reexamine its

2    obligations, under its by-laws, to pay non-cooperating employees'

3    legal fees") (emphasis in original).

4        Although a direct threat of termination may not be

5    necessary, the defendant must have believed the statements to be

6    compelled on threat of loss of job and this belief must have been

7    objectively reasonable. United States v. Vangates, 287 F.3d

8    1315, 1321-22 (11th Cir. 2002); accord Stein II, 440 F. Supp. 2d

9    at 328 ("an individual claiming that a statement was compelled in

10   violation of the Fifth Amendment must adduce evidence both that

11   the individual subjectively believed that he or she had no real

12   choice except to speak and that a reasonable person in that

13   position would have felt the same way").  Thus, "the defendant

14   must have subjectively believed that he was compelled to give a

15   statement upon threat of loss of job [and] this belief must have

16   been objectively reasonable at the time the statement was made."

17   Vangates, 287 F.3d at 1322.

18       Here, there is no evidence to show that defendants had an

19   objectively reasonable belief that they faced a "clear-cut

20   choice" between asserting their rights or suffering economic

21   hardship.  Defendants' own declarations do not demonstrate that

22   anyone threatened them with termination if they did not cooperate

23   with the internal investigation.  None of the defendants describe

24   being threatened with termination by Mr. Whiting.  The Whiting

25   Memorandum is consistent with defendants' own declarations in

26   that it does not overtly threaten defendants' employment.  It

27   rather states, "the Company expects you to cooperate fully in

28   [the investigation]," and asks defendants to "please answer all

21

[the investigators'] questions and furnish all information they request." McCormick Decl., Exh. C1 at 1. The only reference to termination in the Whiting Memorandum assures defendants that they are not being terminated and that if indications of misconduct are found, defendants would be allowed to present their side of the story. Id. Nor were defendants threatened with nonpayment of legal fees.[9]

Defendants' claims of coercions are thus analogous to the claims rejected by the district court in Ferguson, 2007 WL 4240782, where a defendant claimed that his statements were involuntary because "he feared losing his job if he did not cooperate." Id. at *7. Defendant relied on a letter from his employer which informed him that non-cooperation "may result . . . in a reassessment by [the Company] of the factors governing whether it is obligated to indemnify [defendant] for [his] reasonable legal expenses," then noted that such indemnification was condition on the Company's obligations as set forth in its by-laws. Id. at *5. The district court concluded that this letter "did not force [defendant] to choose between asserting his rights and losing his job," and thus rejected defendants' motion to suppress his statements. Id. at *7; see also United States v. Waldon, 363 F.3d 1103 (11th Cir. 2004) (holding that defendant's belief that he would be fired from sheriff's department if he did not testify was not objectively reasonable because department

---

[9] Defendants cannot claim that the McNulty Memorandum created such a threat: unlike the Thompson Memorandum, the McNulty Memorandum expressly disclaims consideration of the company's payment of attorney's fees.

regulations did not require testimony under threat of sanctions but only reflected a general expectation that officers would cooperate and testify).

United States v. Saechao, 418 F.3d 1073 (9th Cir. 2005), is inapposite.  Saechao involved a probationer whose probation terms compelled him to "truthfully answer all reasonable inquiries" from his probation officer or face revocation.  Id. at 1075.  On these facts, the Ninth Circuit had little difficulty concluding that "[defendant] did not have the luxury of remaining silent without violating the conditions of his probation."  Id. at 1078. Here, by contrast, there has been no showing of employment terms or other provisions that would compel defendants to answer the investigators' questions.  All defendants have shown is a request from their supervisor to cooperate with the investigation, and nothing more.

Almost forty years ago, the Second Circuit recognized that the rule against involuntary confessions did not preclude scenarios where defendants had to make difficult choices regarding whether to cooperate with an internal investigation: "To be sure, [defendant's] position was not a particularly pleasant one.  But the rule excluding involuntary confessions does not protect against hard choices when a person's serious misconduct has placed him in a position where these are inevitable."  United States v. Solomon, 509 F.2d 863, 872 (2d Cir. 1975) (Friendly, J.).  Over the years, this idea has been reiterated in several different cases rejecting claims of Garrity compulsion.  See, e.g., Aquilera v. Baca, 510 F.3d 1161, 1171-73 (9th Cir. 2007) (rejecting deputies' Fifth Amendment claim

23

1   because there was no evidence that deputies were compelled to

2   answer questions; "[i]t is of no moment that refusing to answer

3   the investigators' questions could have resulted (and, in fact,

4   did result) in [deputies'] reassignment"); <u>United States v.</u>

5   <u>Stein</u>, 233 F.3d 6, 16 (1st Cir. 2000)(finding no <u>Garrity</u> issue

6   where attorney claimed she was compelled to answer questions

7   before state bar; court reasoned that although she faced risk of

8   disbarment, it was not automatic); <u>United States v. Bowers</u>, 739

9   F.2d 1050, 1056 (6th Cir. 1984) (holding <u>Garrity</u> not implicated

10  when employee not told he would lose job if he did not submit to

11  interview).

12       The district court's conclusions in <u>Stein II</u> are consistent

13  with these cases.  The district court concluded that it should

14  suppress statements made by two defendants who were expressly

15  threatened with termination and/or nonpayment of legal fees by

16  KPMG if they refused to cooperate with the government.  <u>Id.</u> at

17  331 ("The Court finds that [defendant 1] made the statements at

18  the proffer sessions because KPMG threatened to fire him and cut

19  off payment of his legal fees if he did not [cooperate].") & 332

20  ("KPMG coerced his appearance [at proffer sessions with the

21  government] by conditioning payment of his legal fees on his

22  appearance and cooperation.").

23       Because there is no evidence to support an objectively

24  reasonable belief that lack of cooperation with the internal

25  investigators would result in termination, the Court should

26  conclude that defendants' statements were not compelled.  For

27  this reason, defendants' Fifth Amendment rights were not violated

28  by the Steptoe interviews.

1

**IV.**

2

**<u>CONCLUSION</u>**

3     For the foregoing reasons, defendants' motion to suppress

4 should be denied.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

25

1          **DECLARATION OF BRIAN J. SMITH**

2          I, Brian J. Smith, declare as follows:

3          1.    I am a Special Agent with the Federal Bureau of

4    Investigation ("FBI").  I am currently assigned to the Washington

5    Field Office ("WFO") and focus on investigations of violations of

6    United States law, particularly those involving foreign bribery.

7    I am the lead Special Agent in the case of United States v.

8    Stuart Carson, et al., Case No. SA CR 09-00077-JVS.

9          2.    I have reviewed the FBI's case file for the

10   investigation of corrupt payments at Control Components, Inc.

11   ("CCI"), to determine if there were FBI agents present at CCI on

12   August 16 and/or 17, 2007.  The case file reflects that the FBI

13   opened its investigation of CCI and its executives after FBI

14   headquarters received an e-mail summary on or about October 16,

15   2007, from an attorney in the Fraud Section in Washington, DC.

16   The FBI opened its investigation on October 19, 2007; the case

17   file does not reflect any earlier activity.  There is nothing in

18   the case file that reflects a lead or other request being made to

19   the Los Angeles Division of the FBI to send Special Agents to CCI

20   in August 2007.

21         3.    I queried the FBI's Automated Case System ("ACS"), a

22   database of the FBI's investigative activity, to see if ACS

23   contained any information about FBI activity at CCI in August

24   2007.  My ACS query returned no information indicating that there

25   were FBI Special Agents present at CCI in August 2007.  I also

26   spoke to Supervisory Special Agent Johannes Vandenhoogen, who

27   supervises a white-collar/corruption squad of agents in the Santa

28   Ana Resident Agency ("SARA").  SSA Vandenhoogen reviewed control

1

1 | files at SARA and found no reference to any involvement by FBI
2 | agents at CCI in August 2007.

3 |     4.    From my review of the case file and other internal
4 | records kept by the FBI, there were no FBI agents at CCI on the
5 | dates in question.

6 |     I declare under penalty of perjury that the foregoing is
7 | true and correct to the best of my knowledge and belief.

8 | DATED: April 2, 2012

BRIAN J. SMITH, Special Agent
Federal Bureau of Investigation

2

1                **DECLARATION OF DOUGLAS F. McCORMICK**

2        I, Douglas F. McCormick, declare as follows:

3        1.    I am an Assistant United States Attorney in the United

4   States Attorney's Office for the Central District of California.

5   I am one of the attorneys representing the government in this

6   matter.

7        2.    Attached hereto as Exhibit "A" is a copy of an undated

8   memorandum issued in December 2006 by then-Deputy Attorney

9   General Paul J. McNulty regarding "Principles of Federal

10  Prosecution of Business Organizations."  This memorandum, often

11  called the McNulty Memorandum for short, was in effect in August

12  2007 at the time of CCI's voluntary disclosure.

13       3.    Attached hereto as Exhibit "B" is a copy of a letter

14  written by the prosecution team to defendants' counsel in

15  response to Mr. Edmonds's counsel's request for "all documents

16  reflecting communications between the Department of Justice . . .

17  and CCI, IMI, or its agents . . . for the period July 1, 2007,

18  and October 31, 2007."  The government's letter confirmed what it

19  had previously told Mr. Edmonds's counsel in person: that it

20  would produce documents reflecting communications between the

21  Department of Justice and CCI's outside counsel, Steptoe &

22  Johnson LLP, for the time period of August 15, 2007, through

23  August 17, 2007.  The letter then re-prints the text of three e-

24  mails between Steptoe & Johnson LLP's Patrick Norton and Mark F.

25  Mendelsohn, who at the time was Deputy Chief of the Fraud Section

26  in Washington, DC.

27       4.    Attached as Exhibits C1, C2, and C3, respectively, are

28  true and correct copies of memoranda written on August 17, 2007,

                                1

1  by CCI's then-President, Ian Whiting, to defendants Paul

2  Cosgrove, David Edmonds, and Hong Carson, respectively.  Each of

3  these copies contains the document control number used in this

4  case to reflect that it has been previously disclosed to

5  defendants' counsel.

6      I declare under penalty of perjury that the foregoing is

7  true and correct to the best of my knowledge and belief.

8  DATED: April 2, 2012

9

10                              DOUGLAS F. McCORMICK

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2